## No. 10.076.

IN THE MATTER OF THE LOUISIANA SAVINGS BANK AND SAFE DEPOSIT COMPANY, IN LIQUIDATION.—ON OPPOSITION TO SECOND PROVISIONAL ACCOUNT.

Payments made by syndics, liquidators and other fiduciaries, under *ex parte* orders of a court, are still open to inquiry as to their correctness.   The practice of granting such orders without notice to those interested and without proof contradictorily made, is, as a general rule, irregular and unwarranted.

But though unauthorized, such orders may be regarded as confirmatory of the good faith and honestv of those making the payments.   And when the charges made are not extravagant, on their face, and were for services of experts. attorneys and others, rendered under the eye of the court, and some of whom were appointed by the court without opposition, and the conduct and administration of the fiduciaries is free from

suspicion of fraud, the payment will be viewed as *prima facie* correct, and in the absence of sufficient evidence to negative or rebut such presumption, the payments will not be rejected.

When an insolvent estate or banking institution is administered by three liquidators, whose commissions are fixed by law, they will not, in addition to such commissions, be authorized to charge a salary for their services. Nor will they be entitled to the assist ance of clerks, unless they first show that from the intricacy of accounts, or other cause, the services of the clerks were a necessity, and obtain the authority of the court for their employment, when they have already the help of two experts in the work of liquidation.

The depositor becomes the ordinary creditor of the bank unless he makes a deposit in kind, as defined by the Code. Civil Code, Arts. 2940, 2943, 2944, 2945, 2963, 3522; 9 La. p. 50; 17 La. p. 162; 10 Ann. p. 342.

A PPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

---

*Blanc & Butler* and *H. C. Miller* for John Crossley & Sons, Opponents and Appellants :

The liquidating commissioners of insolvent banks can claim no salaries. but are restricted to the commissions allowed by the law. R. S., Section 1818.

Nor can they subject the estate to pay salaries for clerks, save in exceptional cases, where the necessity exists, and then the charges must be reasonable, the theory of the law being that the commissioners must themselves render the necessary clerical services for which their commissions are compensation. 1 Ann. 21.

Experts are authorized to be appointed to state complicated accounts, not to instruct the court on the general issues of the case. If there are no accounts to be stated the estate cannot be subjected to pay expert fees. If there are such accounts, the fees must be proportioned to the labor requisite and performed by the experts. C. P., Arts. 433, 444.

Counsel fees incident to the liquidation of on insolvent bank must be proportioned to the services rendered, and to the result of the litigation in which the services are claimed to have been rendered. 12 Ann. 533.

The payment of debts of an insolvent estate or bank by liquidating commissioners must be on an account notified to creditors by advertisement. and after judgment of homologation. Payments of claims against insolvent estates in course of administration, made on *ex parte* orders, will not bind creditors unless sustained by proof. R. S., Section 1815; Civil Code, Arts. 1179, 1180, 1185, *et seq.*

The depositor becomes the ordinary creditor of the bank unless he makes a deposit in kind, as defined by the Code. Civil Code, Arts. 2940, 2943, 2944, 2945, 2963, 3522; 9 La. p. 50 17 La. p. 162; 10 Ann. p. 342.

*Horner & Lee* for the Porter Heirs, Opponents and Appellants.

*James B. Guthrie* and *James D. Seguin* for Milton C. Randall, Opponent and Appellant.

*W. S. Benedict* and *Chas. S. Rice* for Appellee.

---

The opinion of the Court was delivered by

Todd, J. The Louisiana Savings Bank and Safe Deposit Company was placed in liquidation in June, 1879. On the 16th of June, 1887,

the · liquidators, or commissioners, filed their second provisional account.

This account exhibits assets as follows :

| | |
|---|---|
| Dividend to commissioners by bank when they took charge.$ | 43,171 70 |
| Proceeds sale bank building............................ | 52,700 00 |
| Received on account.................................... | 6,870 00 |
| Making total assets.............................. ....$ | 102,321 70 |

The total charges on the account amount to $81,197.

Oppositions were filed to the account by the heirs of Royal A. Porter, deceased, Milton C. Randall and John Crossley & Sons, and from adverse judgments these opponents have appealed.

## I.

### OPPOSITION OF THE PORTER HEIRS.

Upon the settlement of the succession of Royal A. Porter, the father of these opponents, their distributive shares were found to be in the aggregate of $9866.15, which sum was deposited in the Louisiana National Bank to the credit of the succession of the decedent, subject to the control of the mother and natural tutrix of the heirs, then minors.

On the 12th of June, 1878, under an order of the Second District Court of New Orleans, this fund was withdrawn from the bank mentioned and deposited in the Louisiana Savings Bank, where it drew interest, which was paid to the tutrix.

On the 31st of May, 1879, an order of the same court was rendered, directing the withdrawal of said fund from the Savings Bank and the investment thereof by the tutrix in United States bonds.

On the 4th of June thereafter this order was presented to the president of the bank, who, after a short delay to ascertain the correctness of the order, informed the tutrix that no United States bonds could then be purchased in New Orleans, but that he would take the money and send it to Washington City and there purchase the bonds for the heirs. To this the tutrix agreed and surrendered her bank book and received two certificates of deposit—one for the shares of the two youngest heirs, and the other for the oldest, who had then been emancipated—accompanied by the assurance of the president of the bank that these certificates would be exchanged for the bonds as soon as they arrived, which, it was stated, would be about the 7th of July. The bonds never came; the investment was never made, in fact, and the bank failed—closing its doors on the 30th of June.

It possessed at the time, in cash, $32,639 42, which went into the hands of the commissioners.

On the account of the commissioners, these heirs are placed thereon as ordinary creditors.

They claim, however, by reason of the facts recited above, that their deposit was a special deposit, entitling them to be paid by preference over all creditors. This is the sole question relating to this opposition to be determined.

The contention of the opponents rests entirely on the hypothesis that there was an actual deposit made on the 4th of June, 1879. The actual deposit was really made in June, 1878, and, in point of fact, from that time continuously the fund was in possession of the bank, after the proposed investment of the fund in bonds, as before.

From the time of the actual deposit of the money in June, 1878, the heirs or their tutrix were never in possession of the money.

There was an order of Court, it is true, requiring the fund to be invested in United States bonds, but the fund was not withdrawn for the purpose of this investment, and although there was a promise on the part of the president of the bank to make this investment, or purchase the bonds for the parties, it was never done by him, and the money remained in the bank as before. The issuing of the certificates, even coupled with the promise of the president to invest in the bonds and the purpose of the depositors to effect the investment, did not change the status or condition of the fund and convert the original irregular deposit of 1878 into a real or special deposit.

We cannot, under any reasonable view of the circumstances, construe this deposit as a real or special deposit as contended for by the opponents.

A deposit, as defined by the Code, "is an act by which a person receives the property of another, binding himself to preserve it, and return it in kind." C. C. Art. 2926.

"The depositary cannot make use of the thing deposited without he express or implied consent of the depositor." C. C. 2940.

The depositary ought to restore the precise object which he has received." C. C. 2944.

"The only real deposit is that where the depositary receives a thing to be preserved in kind, without the power of using it, and on the condition that he is to restore the identical object." C. C. 2963.

"He who deposits a thing in the hands of another, still remains the owner of it."

"Consequently his claim to it is preferred to that of the other cred-

itors of the depositary, and he can demand the restitution of it　*　*　*
if the thing reclaimed be identically the same which he deposited."
C. C. 3222.

The deposit thus specifically described in the foregoing articles is
claimed by opponents to be the kind of deposit that was made by
them in the Savings Bank, and upon this claim exclusively their case
rests.

It will be seen that the essential condition of a deposit—a real or
special deposit—is that the thing deposited can be identified.

In this case $9866, in no particular or designated kind of money, was
placed in the bank in June, 1878. In June, 1879, the bank failed, hav-
ing in its vaults in money $32,639.

That the fund deposited more than a year before could be identified
and taken from these moneys found in the bank would certainly seem
impossible, and even that any of this original fund remained and made
part of this balance found was highly improbable.

Yet this identification is essential.

In the case of Longbottom's executors vs. Babcock, 9 L. 50, an
opposing creditor to the executor's account claimed a privilege for or
on account of a special deposit. We quote from the decision as fol-
lows:

" The evidence in the record shows that the deceased was the attor-
ney in fact of Colton Henry during his (Henry's) absence from the
State, and that before his departure he had given his agent (the de-
ceased) a check on one of the banks for $1300, to be disbursed on his
account, and that $1100 was found in the store of the deceased at the
time of his death. But there is no evidence to show that this sum is
the same money received by the testator. Art. 3189 (now 3222 C.C.) re-
quires, in order that the depositor may exexcise his right of privilege,
proof of the identity of the thing deposited must be made. It is of
the essence of deposits that the depositary should be bound to keep
the thing deposited and restore it in kind to the depositor. In this
case the money appears to have gone into the hands of Longbottom
as the agent of Henry. He was bound to account for it, but not to
restore it in kind. He did disburse a part of it for the use of his
principal. The court properly rejected the claim as a privilege."

The case of Matthews, Finlay & Co. vs. their Creditors, 10 Ann. 342,
is confirmatory and even more strongly illustrative of the same prin-
ciple. We quote from that decision:

" The money was counted and debited to the depositaries simply as
so much cash.

" Special or real deposits are usually sealed up, and not counted by the banker, and are to be returned in kind.   *   *   *   The box or package containing the real deposit is endorsed with the depositor's name, and is put away by itself in the vault, there to remain until demanded by the owner, and checks cannot be drawn against it."

In view of the above it is plain that the issuing of the certificates of deposit in this case cannot be regarded as changing in any wise the character of the deposit as contended for by opponent's counsel.

A certificate is given as evidence of the amount standing to the credit of the depositor.   The main object of such certificate is to afford satisfactory evidence of such credit, and to enable the depositor to utilize the credit by drawing checks against or upon the amount so deposited, whereas it is seen from the authority last cited that if it be a special or real deposit, checks cannot be drawn upon it.

The counsel for opponents claim that the identification of the fund was sufficient, because the bank, when it failed, had in its possession cash exceeding in amount the deposit.   We have before adverted to the extreme improbability that any part of this money was part or parcel of the funds originally deposited.   But the authority of the case in 9th La., above cited, is, as we have seen, directly opposed to such contention.

It is true that authorities from other States were cited by the counsel of the opponents that undoubtedly supported their argument, and especially on this particular point, but they belong to a different system, and were the enunciations of equity courts relating to trusts, express or implied, and to trust funds.   While they are authorities entitled to respect, we cannot yield to them in the face of the positive declarations of our written law, and the settled jurisprudence under it.

The claim was properly construed to be an ordinary debt of the bank, and the privilege rejected.

## II.

The claim of Milton C. Randall is for services rendered the commissioners as an expert.

He was paid $3000, but demanded $7000 more, and appeals from a rejection of his demand.

It is strongly urged by the opponents of this claim that there was no necessity for this appointment.   That the issues were such, that the services of an expert were not required.   Were this a matter open to discussion, the necessity for the appointment of an expert might be reasonably questioned.   He was, however, regularly appointed on the

application of the commissioners, without opposition from any of the parties litigants. He rendered continuous services for a long time, but whether the character of those services, and the report made thereof, were strictly within the line or scope of his duties or appointment, it is at least too late to be made a subject of inquiry. The appointment must be considered as regularly and legally made.

We have attentively considered the character of the services rendered, their value to the parties, etc., and at present will content ourselves in saying that we are not convinced that $3000, which the expert received, was an inadequate consideration for the services, and see no reason to disturb the conclusion of the judge a quo, who rejected the demand for further remuneration.

The consideration of this claim will occur again in the course of this opinion.

### III.

The opponents, John Crossley & Sons, were mentioned in the account as creditors, but the amount owing them was stated therein as unknown.

1. By the judgment of the lower court, the amount of the indebtedness of the estate to them was fixed at $41,714.11, with legal interest from the 10th of March, 1886, and the further sum of $14,968.25, with legal interest from the 18th of May, 1886. These sums were in exact conformity to the decree of this Court, rendered on appeal in the case of Crossley & Sons vs. Louisiana Savings Bank, 38 Ann. 75. A larger amount was adjudged by that decree than was given by the judgment now under review, but by that decree a privilege for part of the debt was recognized in certain drainage warrants, and they were ordered to be sold and their proceeds applied as a credit on the debt. They were so sold, and the debt was reduced thereby to the sum or sums allowed by the judgment of the lower court in the instant case.

This adjustment of the debt was undoubtedly correct.

2. They opposed the charges imposed or sought to be imposed on the insolvent estate for salaries of the commissioners, hire of clerks, compensation to experts and fees of attorneys. Their opposition to these charges were all dismissed. As before stated, the entire sum for distribution amounted to $102,321.70. The total charges on this fund for the administration of the insolvency, paid under orders of the court, amounted to $69,000.

(a) The commissions of syndics on sums that came into their hands, as fixed by law, are 5 per cent on amounts up to $50,000, 3 per cent on amounts not exceeding $100,000, and 2 per cent on all sums

Louisiana Savings Bank and Safe Deposit Company in Liquidation.

above $100,000.   So that their entire commissions on $102,321 would be $4046, and no more.

There is charged as commissions on $43,172, the amount first received by the commissioners from the officers of the bank, $2158, and to this is added, "as received on salaries of commissioners," $900 more, making in all $3058.   The charge for commissioners is a proper one, but there is no warrant in law for the additional amount charged on account of salaries, and this must be rejected.

(b)   The charges for clerk hire amount to $2000.   It is to be noted that the entire fund for distribution, $102,321, consisted of $43,172, on hand when the bank failed; $52,700, proceeds of sales of real estate, and $6449, derived from collections.   The creditors among whom this fund was to be distributed, and the respective sums owing them, was a matter of easy ascertainment, and the entire claims of all the creditors could probably have been listed from the bank's books. It seems to us that the three commissioners might have performed this work themselves, and the services of clerks dispensed with.   The rule as to such allowances for clerks in cases like the present one, is thus properly declared in the case of Pandelly vs. His Creditors, 1 Ann., p. 21, quoting:

" The syndics receive a compensation for their services in the shape of a commission.   Among the services the law expects them to render is the keeping of proper official accounts.   Cases may arise in which extraordinary skill as an accountant might be required to unravel complicated accounts left in confusion by the insolvent, and in such cases, upon a distinct allegation by the syndics of the difficulties and necessities of the case, we are not prepared to say that the testimony in support of such allegations would be inadmissible.   Such were not the allegations of the tableau."

The entire charge for clerks, under this authority, which we approve, should have been rejected.   So far, in this instance, from it appearing in the statement submitted by the commissioners, that there was a necessity for the services of clerks, there was no mention made in court or petition for their employment, and no judicial authority obtained therefor.

(c)   There was paid to Milton Randall, as before stated, $3000, and it likewise appears that the further sum of $1500 was paid Edwin Harris, another expert engaged during the administration of this insolvent estate.

The labors of the first named continued three or more years, and of the latter for at least six months.

These parties were appointed by the court without opposition from the creditors or parties in interest, and it is too late to draw in question, as is sought to be done, the necessity or propriety of their appointment.

Opposition is, however, urged to the payments made them for their services.

An examination of the evidence in the record cannot fail to produce the conviction that the services rendered were exceedingly arduous and of great value, even if some of the labors of one of them—Mr. Randall—were misdirected as charged.

The liquidation of this insolvent institution has been attended by the most important and protracted litigation, in which the gravest issues were presented and the most intricate and complicated accounts, amounting to many hundred thousand dollars, were to be adjusted, and some of the most difficult questions and problems relating to banking and book-keeping were to be solved.

These labors were performed under the eye of the judge before whom the proceedings were pending, in which their services were rendered, and who approved the charges and granted express orders for their payment upon the application of the commissioners.

These orders of the judge approving the charges and directing their payment are, however, not to be considered as conclusive in favor of their correctness. On the contrary, as a rule, such orders should be reserved for, or rather confined to, approval of accounts contradictorily rendered, and after due notice and delays, such as are required for the due and regular homologation of accounts and tableaux.

These judicial orders, though irregular, are, however, confirmatory of the good faith of the commissioners in allowing the charges, and whose conduct during their entire administration is free from suspicion of fraud or dishonesty.

The payment of these charges fully comes under the rule so often announced in the decisions of this Court, that where payments are thus made by executors or other fiduciaries in the administration of estates, acting under oath, apparently in good faith, and not extravagant on their face, they are to be deemed and treated as *prima facie* correct. 2 U. S. 596; 6 U. S. 334; 3 R. 283; 6 Ann. 129.

We find in the record no evidence whatever to rebut this *prima facie* presumption in favor of the correctness of these items.

Under these circumstances, we cannot disturb the conclusion reached by the judge *a quo* in dismissing this opposition, whatever might be our opinion of the correctness of these charges, were the

entire matter open to inquiry and the simple proposition presented for the first time, whether the commissioners should pay them in their entirety.

(d.) The fees allowed the several attorneys who were employed during the course of the administration of the insolvency were all opposed as excessive.

This opposition includes the fee of Chas. S. Rice for $2000—$1000 paid already—the fee of T. J. Semmes, $2500, paid, and that of W. S. Benedict, for $10,000, not paid.

In regard to Mr. Rice's fee, the attorneys for the opponent use the following language in their brief, respecting the same. Quoting:

" In view of Mr. Rice's services in placing the bank in liquidation, and other services detailed by him, the opponents would be content with the $2000 charged for, if that is to be in full."

In view of this admission and under the condition expressed, that it is a finality, the charge is approved.

The services were rendered by Mr. Semmes under a contract with the commissioners, in which the amount of his fee was fixed. This was approved by the Court and its payment made in compliance with its order.

As before stated, with reference to the litigation that has transpired during the progress of this liquidation, the amounts involved were very large, the question of law and fact very grave and complicated, demanding the highest professional skill for their determination, and imposing great responsibility, and we doubt not that the commissioners, in making the engagement with Mr. Semmes, were actuated by entire good faith.

For the reasons given with reference to the charges of the experts, we shall decline to disturb the ruling made by the court below with respect to this item.

The services of Mr. Benedict were engaged by the commissioners at the commencement of their administration, and the chief labor and responsibility has fallen upon him as the regular and principal attorney of the estate. They have been arduous in their character and the record shows faithfully performed and of great value. Had he been the only attorney who rendered services in the administration of this insolvency, and his fee the only one to be paid, we do not think the amount charged—$10,000—for the valuable services rendered, would have been too much. But considering the assistance he has received from his able associates and the immense charges that this estate is

burthened with, we think that $6000 would be a reasonable and sufficient fee for Mr. Benedict.

This completes the review of all matters embraced in this obligation.

It is, therefore, ordered, adjudged and decreed that the judgment of the lower court, in so far as it dismisses the oppositions of John Crossley & Sons to the charges of the commissioners for salaries amounting to $900, and to clerks' hire $2000, it be reversed, and the oppositions in this respect be sustained and charges rejected.

That the judgment, in so far as it dismisses the opposition of the charge for fee of W. S. Benedict, it be amended by reducing the charge in fee from $10,000 to $6,000; and that, as thus amended, and in all other respects, the judgment be affirmed. The costs incurred by the oppositions of the Randall and the Porter heirs to be paid by them respectively in both courts, and those incurred by the opposition of John Crossley & Sons, be paid by the liquidation in both courts, reserving to the liquidation the right to recover from the parties whose claims where rejected or reduced the costs incurred by the opposition of the Crossleys to such items.

## ON APPLICATION FOR REHEARING.

FENNER, J. We granted this rehearing solely on two points, viz:

1. The disallowance by our former decree of $2000, placed upon the account as expenses of clerk hire.

2. The disallowance of $900 compensation for special services of commissioners.

### I.

A reference to our opinion in relation to this case, reported in 35th Annual, p. 196, will show that it presents very peculiar features, which need not now be further detailed. Suffice it to say, that these commissioners first selected by the stockholders and, on their request, appointed by the court, were placed in charge of the affairs of this large bank. These affairs were extensive and complicated. The case was not like an ordinary insolvency in which the insolvent is required to present a full statement of his affairs in the shape of elaborate schedules, setting forth the assets and liabilities with proper particularity and information as to all the items thereof.

In such a case the syndics, thereafter appointed, find in these schedules a proper basis for intelligent action, and have the right to exact from the insolvent all further necessary information.

But these commissioners had no such aids. They were bound to

do for themselves what the ordinary insolvent would have been required to do at the outset—to ascertain the nature and extent of the assets and liabilities, and the relations of the bank generally to third persons, so as to elucidate and understand its affairs, and thus be enabled to liquidate them properly.

It is obvious that, under such circumstances, the aid of at least some of the clerical officers of the bank was absolutely essential, and that, without such aid, the commissioners must have been like a ship without a rudder.

It is, therefore, apparent, from the nature of things, that the retention and payment of such officers were proper and necessary, and finding that the charges now assailed were submitted to and approved by the court, and were actually paid under judicial order more than eight years ago, we conclude that we applied too strictly the rule laid down for ordinary syndics, and that the ruling of the district judge on this subject should have been left undisturbed.

## II.

As to the allowance of $900 to the commissioners for special services, we see no reason to change our former opinion. But as the payment has been actually made, as the present account is only provisional, and as it appears that a larger amount will properly come to them, as legitimate commissioners, on their final account, we will permit the present allowance to stand, with provision that it shall be credited to any future allowance for commissioners.

It is, therefore, ordered that our former decree herein be amended so as to affirm the judgment appealed from in so far as it rejected the oppositions to the charge for clerks' hire, and also to affirm it in so far as it rejected the opposition to the charge for salaries; provided, however, that said charge is to be deducted from any future allowance for commissioners; and that, as thus amended, it remain undisturbed.