13 So.2d 833

In re HIBERNIA BANK & TRUST CO.

In re MURPHY et al.

Nos. 36938 and 36942.

April 12, 1943.

Rehearing Denied May 17, 1943.

Hugh M. Wilkinson, E. F. Steiner and Harold Moses, all of New Orleans, for relators.

Dufour, St. Paul & Levy, Montgomery, Montgomery & Fenner, Bertrand I. Cahn, and Stirling Parkerson, all of New Orleans, for respondents.

Wm. C. Dufour, S. J. Tennant, Jr., and Wm. H. McClendon, Jr., all of New Orleans, amici curiae.

ROGERS, Justice.

Wilfred J. Begnaud, State Bank Commissioner, through his special agents, R. N. Sims and J. Edward McGuire, liquidators, who are in charge of liquidating the affairs of the Hibernia Bank & Trust Company, acting under Section 1 of Act 300 of 1910, petitioned the Civil District Court for an order authorizing the Commissioner to compromise a claim against certain directors of the defunct bank. Petitioners annexed to their petition a copy of the proposed compromise agreement.

As shown by the allegations of the petition and the attached agreement, the claim sought to be compromised amounted to $773,395.95, together with five per cent per annum interest thereon from December 31, 1932. Petitioners alleged, in substance, that the claim arose out of certain loans, which they alleged the bank made to its former directors, either directly or indirectly, through the Hibernia Securities Company, Inc., an interposed party. The proceeds of these loans were used by the directors in connection with certain syndicate agreements they entered into in the years 1928 and 1929 and thereafter extended through the three following years. The agreements provided that the liability of each subscriber should be limited to his proportion of the stock purchased, that is to say, the subscribers were to be liable each for himself but not for each other. On January 3, 1933, the members of the syndicate signed an agreement acknowledging an individual liability of $29,664.60. After allowing certain credits to the members of the syndicate, the indebtedness of the syndicate to the Hibernia Securities Company, Inc., and of the Securities Company to the bank was reduced to $773,395.-95, the amount of the principal claimed. The members of the syndicate denied any liability on the claim asserted by the petitioners. The petitioners set forth the denial of liability and also alleged they had been advised that the members of the syndicate, if sued, would plead prescription and deny that the agreement signed on January 3, 1933, interrupted the running of prescription; that the legal representatives of the deceased members of the syndicate would invoke Act 11 of 1926, providing that parol evidence shall not be received to prove a claim against a deceased person unless the action be commenced within a year subsequent to his death. Petitioners alleged they believe the proposed compromise would be "preferable to a suit, the pendency of which would extend over a period of years and the outcome of which would be doubtful, and petitioners accordingly submit the said compromise to the court for its approval." Petitioners further alleged that the proposed compromise had been approved by the Reconstruction

Finance Corporation, pledgee of the entire assets of the Hibernia Securities Company, Inc.

The compromise agreement provided for the payment to the petitioners, in cash, the sum of $87,500 plus a balance of $24,133.65 in the hands of the manager of the syndicate, plus the further sum of $75,001.93, representing the settlement of the balances due by two of the members of the syndicate, or a total of $186,635.58. The agreement provided for the release from all further liability of the natural persons and successions by whom full settlement of their proportionate shares of the claim had been previously paid, together with the two syndicate members who were to pay $75,001.93 and for the relinquishment of all claims of solidary liability against the members of the syndicate. The agreement further provided for the reservation by petitioners of certain rights and claims against members of the syndicate who had not paid any, or only a portion of their proportionate share of the syndicate obligations.

Certain depositors, constituting approximately one per cent of the depositors in number and three per cent in amount, formed an organization known as the Independent Depositors' Association. They then filed an opposition to the application of the State Bank Commissioner to be permitted to enter into the proposed compromise agreement. Opponents alleged that the loans to the former directors were illegal; that the directors were guilty of a breach of trust and that they are liable in solido to the bank, or to the liquidators for their illegal acts in spite of the syndicate agreement to the contrary. Opponents prayed that the proposed compromise be rejected and that the State Bank Commissioner be ordered to institute suit against the former directors of the bank for the full amount of the claim, with interest.

For the purpose of proving the allegations of their opposition, opponents summoned forty-four witnesses and asked for the production of numerous documents.

After the trial judge heard the arguments of the petitioners and of the opponents, and while the matter was under consideration, the Federal Intermediate Credit Bank of New Orleans and the Federal Land Bank of New Orleans, alleging themselves to be depositors and creditors to the extent of approximately nine per cent of the total remaining deposits, filed a petition opposing the approval of the proposed compromise. These opponents alleged that they did not have sufficient knowledge or information to permit them to either affirm or to deny the truth of the allegations contained in the opposition filed on behalf of the other depositors and did not predicate their opposition upon those allegations, but they nevertheless urged that the matter be heard in order that the truth or falsity of the charges might be determined.

The trial judge denied the motion of opponents that he hear witnesses and receive other evidence in support of their oppositions, and announced "that the order authorizing the State Bank Commissioner to enter into the proposed compromise will be granted." After handing down written

reasons for his ruling, the trial judge signed the order authorizing the compromise.

Opponents, through their counsel in open court, gave notice to the trial judge and to counsel for the liquidators of their intention to apply to this Court for writs of mandamus, prohibition and certiorari and likewise delivered to the trial judge and opposing counsel copies of their petition to this Court and the brief in support thereof prior to filing them in this Court.

On December 1, 1942, George F. Murphy and other depositors filed their appplication for writs in this Court. The application was docketed under the number 36,938. On December 2, 1942, the Federal Intermediate Credit Bank of New Orleans and the Federal Land Bank of New Orleans filed their application for writs in this Court. The application was docketed under the number 36,942. Both applications were granted.

The trial judge has filed a return in each case, transmitting to this Court the original record called for and setting forth "that his reasons for his action in this matter are in writing and are on file in these proceedings."

Disputing the principles of law and the correctness of many of the facts set forth therein, the bank commissioner, his special agent, and the liquidator also have filed a return to relators' petition for supervisory writs.

Since the issues raised by the relators in their applications for remedial writs are, for all practical purposes identical, the applications will be considered together and disposed of by a single decree.

We quote the pertinent portion of the written reasons assigned by the trial judge in support of his ruling under review, to-wit:

"The liquidation of banks in Louisiana is statutory and not judicial in character. Hiern v. Interstate Trust & Banking Co., 178 La. 998, 152 So. 684; Interstate Trust & Banking Co. v. Jones County, Miss., 5 Cir., 77 F.2d 806. The State Bank Commissioner, a constitutional officer, is vested by law with full supervision and control of banking institutions, and he, alone, has the authority, under the conditions prescribed in the statute, to take over banks for the purpose of liquidating them. In the conduct of the liquidation proceedings, he is given full discretion, and only in certain rare instances is he required to secure the authority or approval of a court of justice. Section 1 of Act 300 of 1910 provides that the State Bank Commissioner, on the order of the District Court of the domicile of the bank, may sell or compound all doubtful debts. The Statute does not require that the proposed order, to be issued by the Court, shall be placed upon the order book or that it shall be published or posted in any manner, nor does the statute require that any period of time elapse between the date of the application for the order and the date of the signing of the order. The statute does not provide that any hearing or legal proceeding of any kind shall be held or conducted by the Court. No provision is made for the filing or trial of oppositions. In the

instant case, the Court was advised by the attorneys for the State Bank Commissioner that opposition to the granting of the order would be made, and for that reason the order applied for was not granted until the opponents had an opportunity to file their opposition and present their arguments in support thereof.

"The State Bank Commissioner contends that it is the ministerial duty of the Court to grant the order; that the Court has no discretion in the matter, and that the sole purpose of the statute in requiring the order is to make a public record of all compromises effected by the State Bank Commissioner. In re Union Bank & Trust Co., 183 La. 268, 163 So. 97; Hiern v. Interstate Trust & Banking Co., supra. The opponents on the other hand, contend that the Court must try the case to the same extent and in the same manner as a trial would be conducted were the Court hearing a suit by the State Bank Commissioner against the former directors. I do not believe the statute contemplates any such trial. To begin with, it would present the anomalous situation of the trial of a cause against a prospective defendant who was not a party to the proceedings, and an adjudication of the rights and obligations of such a defendant in his absence. Such a hearing and adjudication would be without due process of law. Furthermore, a hearing and adjudication of this kind would, for all practical purposes, destroy the object of the statute and make a compromise impossible, as a determination of the cause in favor of the prospective defendant's position would result in the withdrawal of the compromise offer, and a determina-

tion against the prospective defendant would necessarily result in a denial of the authority to compromise.

"I do not believe that the Legislature, in requiring that an order of Court be secured, contemplated that there should be such a hearing or trial, or that the Court should substitute its judgment as to the advisability of the compromise for that of the State Bank Commissioner. I believe that, at most, it is the function of the Court to determine whether the claim is an admitted or a disputed one, and whether there has been an abuse of discretion on the part of the State Bank Commissioner. If the Court concludes that the claim is a disputed one and that there is no abuse of discretion on the part of the State Bank Commissioner, I believe it is the duty of the Court to issue the requested order. The statute vests all discretion in the matter in the State Bank Commissioner because he is cognizant of all of the details of the liquidation proceedings and of the nature, validity and collectibility of the numerous debts due the bank, and he is in a better position than the Court to determine what is a reasonable compromise under all the circumstances of the case. In the absence of an abuse of discretion on the part of the State Bank Commissioner, I do not believe the Court should endeavor to substitute its judgment for his judgment.

"In the instant case, looking at the matter in the light most favorable to the opponents and assuming that they can prove all of the relevant facts, as distinguished from conclusions of law, alleged in

the opposition, there are, nevertheless, many serious defenses that have been suggested to the Court in the pleadings and during the argument. It is not necessary to detail those possible defenses here. It is sufficient to point out that the debt is not an acknowledged one, but is a disputed one, within the meaning of the statute.

· "In addition to the State Bank Commissioner, the Reconstruction Finance Corporation has recommended the approval of the compromise. That Corporation made loans to the bank before and during the liquidation proceedings aggregating $25,750,-000.00. These loans were used in large part to pay or make possible the payment to the depositors of a liquidating dividend aggregating 45.85 per cent of their deposits. These loans made by the Reconstruction Finance Corporation have not yet been repaid in full.

"I believe that great weight should be given to the recommendations of the Reconstruction Finance Corporation, as long as its loans, made in the interest of the depositors, remain unpaid.

\*  \*  \*  \*  \*  \*

"Under the circumstances, it cannot be said that the State Bank Commissioner has abused the discretion vested in him by the Legislature."

■ By Act 300 of 1910 the Legislature conferred upon the State Bank Examiner (now the Bank Commissioner) the power and authority to close banking institutions and liquidate their affairs and assigned to the state courts and the state treasurer certain duties in relation to such liquidations. The bank commissioner is a statu-

tory officer and not an officer of the court as are ordinary receivers. His powers and duties are conferred and limited by the statute.

Section 1 of Act 300 of 1910 provides: "\* \* \* He [the State Examiner of State Banks, now the Bank Commissioner] shall collect all moneys and claims belonging to it, and, on the order of the District Court of its domicile, may sell or compound all doubtful debts." (Brackets ours.)

■ The bank commissioner, even on the order of the court, may compromise only doubtful debts. Doubtful debts include those debts that are doubtful either as · to validity or as to collectibility. There has never been any judicial interpretation of the clause authorizing the bank commissioner to compound a doubtful debt on the order of the district court of the domicile of the banking institution.

It is contended on behalf of the bank commissioner that, in the liquidation of banking institutions, the commissioner exercises administrative rather than judicial functions; that as the administrator of insolvent banking institutions, he is charged, among other duties, with determining whether a debt due the liquidation is doubtful, and, as such, may be compounded; that no duty is imposed upon the court, also acting administratively and not judicially, to approve or disapprove the commissioner's recommendation to compound an alleged doubtful debt; and that it is the ministerial duty of the court to issue its order authorizing the· commissioner to compound a debt which he deems to be

doubtful on the mere presentation of his application to do so.

We can not agree with the proposition that the state banking act authorizes the courts of this State to act merely in administrative capacities in the liquidation of insolvent banking institutions. The affirmance of the proposition would necessarily imply that the courts are nothing more than rubber stamp courts whose only duty is to place the stamp of approval on the action or non-action of the bank commissioner. If no duty rests upon the courts to consider all the facts and circumstances attending a proposal to compound an alleged doubtful debt in order to determine whether it would be an advantageous transaction from the standpoint of the liquidation, the statutory requirement that the commissioner obtain the sanction of the court for his proposed action is meaningless. The entire responsibility for compounding debts of the liquidation might just as well have been placed exclusively with the bank commissioner. If an order of court authorizing the execution of the proposal to compound a debt of the liquidation is essential to the validity of the transaction, the court is necessarily vested with some discretion to determine whether it is right and proper to grant the order. This discretion is not subject to the control of the bank commissioner. The commissioner may negotiate the terms governing the agreement to compound the debt, but it is the order of the court which effectuates the contract. If the court, in issuing the order, abuses its discretion, its action may be controlled by a superior tribunal.

Many of those obvious truths were pointed out by the Supreme Court of Arkansas in the case of Jefferies v. Wasson, 187 Ark. 519, 60 S.W.2d 903, involving the powers of the bank commissioner under a statute requiring an order of court to permit the compounding of doubtful debts and the sale of real or personal property. In that case the bank commissioner, who had rejected an offer to purchase the remaining assets of the bank, resisted a proceeding instituted by certain depositors seeking an order of court authorizing and directing the sale of the assets. The opposition of the bank commissioner was grounded on the proposition that the court was powerless to act on the petition of the depositors and could act with respect to the sale only at the instance and upon the petition of the commissioner himself. The Supreme Court of Arkansas rejected the contentions of the bank commissioner and held that the court was vested with jurisdiction to hear and determine the matters presented by the petition of the depositors.

In exercising its discretion to grant or refuse an order authorizing a proposal of the bank commissioner to compound an alleged doubtful debt of the liquidation, the Court must be governed by the situation and peculiar circumstances of the case. The court must satisfy itself by a preliminary examination that it is right and proper to grant such an order. This examination may consist of the careful consideration of the averments of the bank commissioner's application itself or of the facts developed by an independent inquiry. There can be no question of the court's power, of its own motion, to order an in-

dependent inquiry into the facts. Whether the inquiry may be had at the instance of depositors or other interested persons is the serious controversial issue raised by the bank commissioner.

In the exercise of his functions and powers, the bank commissioner represents the interests of the depositors and creditors. There is no dispute about that. In fact, it is expressly stated in the brief filed by the attorneys for the bank commissioner that "we are really not here to argue against the relators. They and we are, fundamentally, on the same side of the case." After making that statement, the attorneys for the bank commissioner further say: "Our interests, as they say theirs are, are those of the depositors, but we have a different idea from theirs of how those interests can best be served. It is our sincere belief that the most advantageous, for the depositors, disposition of this claim would be to execute the proposed compromise; and it is our purpose to present in outline the arguments that would be made against us if we filed suit and to give the Court such information as will enable the Court to form an estimate of their weight."

Their interests being identical, there would seem to be no good reason why the bank commissioner should object to a hearing provoked by the depositors as to whether the proposed compromise would be advantageous to them. It would further seem that the depositors themselves would be better judges than the bank commissioner of what would best serve their interests under the circumstances.

No doubt the arguments which the bank commissioner states would be made against the bank's claim against its debtors, if suit were filed thereon, have been considered by the dissatisfied depositors and their attorneys. Notwithstanding this fact, they are opposing the proposed compromise and vehemently insisting that the suits be filed and prosecuted to final judgment.

It is argued on behalf of the bank commissioner that Act 300 of 1910 makes no provision for the giving of any notice of a proposed compromise, and hence, it is clear from the terms of the statute itself that the legislature did not intend that any person should have the right to demand a trial of the matter to be compromised. It is said that the wisdom of the legislature in not providing for notice has been demonstrated in the liquidation of banking institutions wherein justice and good conscience demanded the execution of many compromises. And the belief is expressed that few of the many advisable compromises would have been completed if it were necessary to give prior notice thereof.

In Hiern v. Interstate Trust & Banking Co., 178 La. 998, 152 So. 684, 688, in considering Act 300 of 1910 in connection with a depositor's suit for the appointment of liquidators of an alleged insolvent bank, this Court expressed the opinion that the scope of the legislation was to make the jurisdiction of the bank commissioner exclusive, "unless, perhaps, he has refused to act or is acting in such a way as to jeopardize the rights of interested parties." The import of the decision is that the bank commissioner is free from

the control of the courts except, first, in those matters where he is expressly required to submit himself to the judgment of the court; and, second, under generally recognized legal and equitable principles when he is acting in such a way as to jeopardize the rights of interested parties.

It is argued on behalf of the relators that unless the clause in the bank liquidation act "on the order of the District Court of its domicile, may sell or compound all doubtful debts," be interpreted in the light of generally applicable legal and equitable principles, the bank commissioner would be vested with unlimited power to injure interested parties and they would be remediless against his actions, that this would violate the letter and spirit of section 6 of Article 1 of the State Constitution granting persons an adequate remedy by due process of law for injuries done them in their rights, lands, goods, persons or reputations, and section 2 of Article 1 of the State Constitution and the Fifth and Fourteenth Amendments of the Federal Constitution prohibiting the deprivation of property without due process of law.

It is argued on behalf of relators that on the face of the statutes themselves (Act 300 of 1910, providing the manner of liquidating insolvent banking institutions, and Act 75 of 1932, prescribing the method of negotiating loans on the assets of the institutions), there is no way in which the bank commissioner, although he is the statutory liquidator, can divest the insolvent estate of any of its assets without giving the creditors an opportunity to judicially test such divesture of their rights. In support of this phase of their argument, the attorneys for the relators point out that, under section 5 of Act 300 of 1910, the bank commissioner is powerless to pay any claim to which objection is made by any interested party until a hearing thereon be held by the court, and that under Act 75 of 1932, the bank commissioner is powerless to mortgage any asset of the defunct bank until after notice and an opportunity to be heard is given "any person desiring to object" to the proposed loan. In view of these statutory provisions, the attorneys for the relators suggest, and the suggestion carries much force, that it is not logical to assume that the legislature intended to control the discretion of the bank examiner in what might be comparatively small payments or hypothecations, and yet did not intend by requiring similar approval by the court under section 1 of Act 300 of 1910 to control such a divesture of depositors' rights which is involved in the proposed compromise of an indebtedness to the bank of more than $773,395.95 which amount relators claim is wholly insufficient under the facts.

The attorneys for relators cite a number of cases from other jurisdictions interpreting similar bank liquidation statutes, wherein, while conceding that the bank commissioner is a statutory liquidator, the courts nevertheless make it plain that in selling or mortgaging the assets of the defunct bank, or compromising debts due the institution, the commissioner is subject to judicial control. The cases are: In re Provo Commercial & Savings Bank, 95 Utah 366, 81 P.2d 644, Pallange v. Liberty State Bank,

216 Wis. 418, 256 N.W. 708, 97 A.L.R. 164; Isaac v. Marcus, 258 N.Y. 257, 179 N.E. 487; Roundup School Dist. v. Agricultural Credit Corporation, 66 S.D. 186, 280 N.W. 659; Jefferies v. Wasson, 187 Ark. 519, 60 S.W.2d 903; Yeargain v. Shull, 149 Okl. 221, 300 P. 303; and In re Arizona Bank's Estate, 42 Ariz. 62, 22 P.2d 409.

Perhaps the nearest case in point to this case is Pallange v. Liberty State Bank, 216 Wis. 418, 256 N.W. 708, 97 A.L.R. 164. That was an action brought by Pallange on his own behalf and on behalf of all others similarly situated as creditors of the defunct bank to recover damages on an alleged cause of action against the directors of the bank, on the ground that the state commissioners of banks refused to bring the action. Under a statute of Wisconsin, almost identical in terms with the statute of this State, the bank commissioners resisted the suit of Pallange, contending that they were vested with discretion in the bringing of such actions. The depositors, acting through Pallange, refuted the contention, and, in view of the refusal of the bank commissioners to institute an action on the claim against the directors, asserted their right to do so. The contention of the depositors in that case went much further than does the contention of the depositors in this case. Here the depositors are only appealing to the court to disapprove the proposed compromise and to direct the bank commissioner to collect money of the bank which they allege has not been accounted for by the bank directors.

The Supreme Court of Wisconsin held in the Pallange case that although the bank commissioners did not have complete discretion in such matters, the depositors did not have the right to supersede them in instituting the action which the depositors demanded; that their remedy was similar to the remedy resorted to by the depositors in this case. In its opinion, the Court said [216 Wis. 418, 256 N.W. 712, 97 A.L.R. 164]:

"The presentation to the court of a petition showing grounds for the objection to the course pursued by the commissioners and the securing of an order directing the commissioners to show cause why they should not act *will result in the commissioners and the petitioner disclosing facts enabling the court to protect the interests concerned.* Such procedure would be in accordance with the plan of the Legislature and is necessary for the carrying out of the legislative policy in dealing with institutions in which public confidence and interest is involved with private interest. If the commissioners have good reason for delaying the prosecution of the claim, the court, upon being duly advised, will not divest them of the right to the cause of action. If ulterior motives control the commissioners, the court will be in a position to adjust conflicting interests so that a single action for a single recovery may be instituted under conditions which will protect the rights of all." (Italics ours.)

The Supreme Court of Wisconsin pointed out that such a ruling "does not result in a mere technical point, but goes to a substantial matter necessary to maintain the

integrity of the discretion lodged in the commissioners by statute and results at the same time in a protection of rights of creditors which may be jeopardized by the negligence or fraud of the commissioners."

The Pallange case was cited with approval by the Supreme Court of South Dakota in the case of Roundup School Dist. v. Agricultural Credit Corporation, 66 S.D. 186, 280 N.W. 659, 661. This also was an application by creditors to sue on certain assets of a state bank when the state bank commissioner had refused to do so. The statute of South Dakota, which is similar to the Louisiana statute, reads as follows: "He (Superintendent of Banks) shall collect all debts due and claims belonging to it and may upon order of the circuit court, after having made application therefor, sell or compound any or all bad or doubtful debts * * *." Rev. Code 1919, § 8928.

The Supreme Court of South Dakota, after quoting from the statute of that state, said: "From this it appears that the primary duty of the Superintendent of Banks is to collect debts due or claims belonging to a trust. If he desires to sell or compromise bad or doubtful claims, he must secure authority from the supervisory court in a proceeding which will permit interested persons to question, and the court to pass upon, the wisdom of his judgment." In the Roundup School District case, the bank commissioner pleaded "lapse of time" as an inducement for making the proposed compromise. The Supreme Court of South Dakota answered this plea

in the following words: "These are clearly matters of defense to be asserted by the Corporation [the holder of certain assets which the creditors were seeking to recover], and, in our opinion can best be considered in connection with the plenary trial wherein both parties are afforded opportunity to fully develop the facts." (Brackets ours.)

In liquidations such as this, the Court, from necessity acts in all ordinary administrative matters upon the ex parte petition or motion of the liquidator without formal notice to the parties in interest. This is because usually in those matters the parties in interest are numerous and widely scattered, and to require notice of every step to be taken in the course of the administration would hinder or embarrass the liquidator and involve the estate in needless and excessive costs. But in matters of great importance, vitally affecting the mass of the estate and interests of the creditors, it would seem that in all equity and justice, some kind of notice should be given to the parties whose rights and interests are to be affected.

Although there is no express provision in section 1 of Act 300 of 1910 requiring notice of a proposed compromise of an alleged doubtful debt to be given interested parties, as by spreading the application on an order book or by advertisement, it clearly would be the better and safer practice to give such notice, at least by publication, in the more important steps taken in the liquidation proceedings. Such notice would protect the important right of creditors to intervene when the

circumstances call for such intervention and would avoid any question as to the constitutionality of the statutory provisions or of any injustice being done the rights of the creditors.

But, whether, under our bank liquidation statute, the bank commissioner may compound a debt due the defunct banking institution without prior notice to interested parties, we are not called upon here to decide. The objecting depositors have taken notice of the bank commissioner's application to compound the debts described therein and have appeared in court and filed their oppositions thereto. They are clearly entitled to be heard on their oppositions.

As was pointed out by the Supreme Court of Wisconsin in the Pallange case: "They [the bank commissioners] can not extinguish or forgive a debtor a valid claim by abandoning it any more than they can settle one upon partial payment. Unless sufficient reason for a compromise exists from the standpoint of the estate in their charge, the commissioners must collect in full. * * * Should the commissioners' effort or proposal to compromise any claim be objectionable to any creditor, such creditor has the right to be heard in opposition to such compromise." (Brackets ours.)

The court below conceded, at least to the extent of presenting arguments in support of the contentions set forth in their oppositions, that relators were entitled to a hearing. The court held, in effect, that it was not called upon to hear evidence before authorizing the proposed settlement of the bank's claim; that as long as the claim is "disputed" and unless there is an abuse of discretion exhibited on the face of the papers, it is the ministerial duty of the court to issue an order approving the settlement proposed by the bank commissioner.

In its reasons for granting the order authorizing the compromise, the court said: "In the instant case, looking at the matter in the light most favorable to the opponents and assuming that they can prove all of the relevant facts, as distinguished from conclusions of law, alleged in the compromise, there are, nevertheless, many serious defenses that have been suggested to the Court in the pleadings and during the argument. It is not necessary to detail these possible defenses here. It is sufficient to point out that the debt is not an acknowledged one, but is a disputed one, within the meaning of the statute."

The statute makes no reference to "disputed" claims. The compounding which the court is called upon to approve or disapprove, as the facts may justify, is that of a "doubtful" debt. This means that the debt is doubtful of collection, either because of some possible vice in the claim itself, or because of the inability of the liquidator to reach the debtor, or the debtor's inability to respond if he can be reached. The claim referred to in this proceeding may be disputed and yet not be doubtful. On the other hand, its validity may be admitted and yet it may be doubtful within the meaning of the statute because of the uncertainty of its collection.

As we have hereinabove pointed out, the discretion of the bank commis-

sioner to compromise an alleged doubtful debt is subject to judicial control. Such control can not be properly exercised without hearing at least some evidence on the nature of the claim in order to determine whether it is, or is not, a doubtful claim.

In its reasons for granting the order authorizing the proposed compromise, the court below declared:

"To begin with, it would present the anomalous situation of the trial of a cause against a prospective defendant who was not a party to the proceedings, and an adjudication of the rights and obligations of such a defendant in his absence. Such a hearing and adjudication would be without due process of law. Furthermore, a hearing and adjudication of this kind would, for all practical purposes, destroy the object of the statute and make a compromise impossible, as a determination of the cause in favor of the prospective defendant's position would result in the withdrawal of the compromise offer, and a determination against the prospective defendant would necessarily result in a denial of the authority to compromise."

As we understand the relators' contentions, they are not seeking to obtain in this proceeding an adjudication on the claims of the bank against directors, nor do they ask the court to hear more evidence than is necessary to permit them to show that the proposed compromise is not justified and desirable from their viewpoint on the grounds suggested for making the compromise. It may be that it would be necessary to hear some evidence in this proceeding that would likewise be material on

a trial of the eventual claim against the directors, but that is no reason for excluding the evidence from a trial of the issues raised by the pleadings in this case, nor is it any reason to exclude such evidence, because any judgment rendered as between the depositors and the liquidators in this case will in no way be binding on the directors. The rule of materiality and irrelevancy of evidence as to the issue between depositors and the liquidators will govern the extent and materiality of evidence to be received to enable the court to determine whether it is to the best interest to the liquidation to accept or reject the proposed compromise.

If, as stated by the court, there are many serious defenses which might be raised to a direct action against the directors of the defunct bank (which is not admitted by the relators), those defenses can be best considered in connection with a preliminary hearing where all parties affected are afforded an opportunity to develop the facts. If, as further stated by the court, all relevant facts alleged in the oppositions can be proved to be true, then it would appear, briefly stated, that a syndicate of directors, under cover of an alleged agency, used the money of the defunct bank for their personal gain; that the directors composing the syndicate were guilty of a breach of trust, resulting in an erroneous monetary loss to the bank. This is likewise indicated by the allegations of the petition of the bank commissioner.

A summary of the charges contained in the opposition filed by George F. Murphy and approximately five hundred other de-

positors shows there are sufficient assets of the bank to respond to the claim of the Reconstruction Finance Corporation, pledgee, and that the depositors are largely dependent for any recovery of their own loss upon the diligent and full collection of certain large claims of the defunct bank against third persons, particularly against groups of the bank's directors who possessed themselves of large amounts of the bank's money, which they used to speculate in stocks in their own interest, and who have never accounted to the bank as trustees for the money.

It is charged in the opposition that for a number of years, possibly since 1913, it was apparently the practice of directors of the Hibernia Bank & Trust Company to form themselves into combinations for the purpose of speculating not only in the bank's stock, but in other securities. A number of such ventures by groups of the directors, or in which the directors had a direct or an indirect interest, are set forth. In all these ventures the money used was procured from the bank. Two of such speculations, in which it is charged that large losses were suffered by the bank, are what are referred to as the Fidelity Securities Company matter and the Hibernia Securities Company matter. The Fidelity Securities Company was a corporation organized by the bank's president and six other directors, with a total capitalization of $35,000, which it is charged incurred a loss of about $765,000. It is further charged that the seven directors composing the Fidelity Securities Company used large amounts of the bank's money

for speculative purposes; that the directors of the Hibernia Bank & Trust Company were also directors and in control of the Hibernia Securities Company and that the use of the bank's money was concealed under pretended loans from the bank to the Hibernia Securities Company and from the Hibernia Securities Company to the Fidelity Securities Company; that the loss incurred in these operations, amounting to $765,000, has not been recovered from the directors who took possession of the bank's funds, nor has the State Bank Commission brought suit on the claim. In the other venture, which is the subject of the proceeding now under consideration, the loss amounted to $773,395.95. It is charged that this loss was the result of the use of the bank's money by its directors, who, in order to conceal their use of the money, adopted the subterfuge of making interposed loans to the Hibernia Securities Company. It is charged that this loss of $773,395.95 was the result of transactions which began many years before the bank was placed in liquidation and which involved speculations made in the capital stock of the bank with a view of controlling the market price of the stock for the benefit of the directors holding the stock. The various transactions in which it is charged the loss occurred are set forth in great detail in the opposition.

These are serious charges which may be, and probably will be, denied by those against whom they are made. But that is no reason why the charges are not relevant to the issue presently before the court in order that the court may determine whether there is any basis for the charges and

whether, as claimed by opponents, the proposed compromise, if consummated, would result more to the financial benefit of the bank directors involved than to the depositors of the bank, particularly since relators also charge that the directors are fully able to respond to judgments if the claims against them are diligently and vigorously pressed to judgment.

The opponents to the compromise have specifically denied that any more than $50,-000 of new money, that is, money not already within the reach of the liquidators, will result from the proposed compromise of a claim amounting to more than $1,000,-000.

In its reasons for judgment, the court states that during the argument of the case, the court was advised that the proposed compromise meets the approval of the Attorney General and of the representatives of the special investigator appointed by the court to look into such matters; also that a depositors' committee, representing the depositors in number and amount, is not opposed to the compromise. In their return to the rule nisi issued herein, the bank commissioner and the other respondents place great emphasis on these remarks of the trial judge. Respondents aver that at the hearing in the court below there were present Mr. William D. Goff, First Assistant Attorney General and ex-officio Attorney for the State Bank Commissioner, and Mr. Joseph Airey, representing the New Orleans Depositors Association, Inc.; that the court ascertained by inquiry in open court during the

hearing that Mr. Goff was in favor of the proposed compromise, and that Mr. Airey and his association had no objection to urge against it. Nothing is said about the representatives of the special investigator referred to by the court. As to these matters, the record itself is silent. Apparently, Mr. Goff and Mr. Airey were present at the proceeding merely in the character of observers. Any statements made by them were purely ex parte. They did not take the witness stand and were not subjected to cross-examination by attorneys for the relators. Mr. Goff did not file any pleading on behalf of the Attorney General, nor did Mr. Airey file any pleading on behalf of the New Orleans Depositors Association, Inc. So far as Mr. Goff is concerned the only connection he had with the proceeding, as shown by the record, is reflected in a letter dated July 1, 1942, addressed to the bank commissioner and the Attorney General, in which he reviews the situation. But this letter does not contain any approval of the proposed compromise. So far as Mr. Airey is concerned, the record does not show what depositors he represented or the number of depositors that are members of his so-called New Orleans Depositors Association, Inc. As a matter of fact, not a single depositor has filed an appearance in court approving the proposed compromise.

The court further says that in addition to the bank commissioner, the Reconstruction Finance Corporation recommended the approval of the compromise and that great weight should be given to its recommendations as long as its loans, made in the

interest of the depositors, remain unpaid. Although the petition of · the bank commissioner contains an allegation that the proposed compromise has been approved by the Reconstruction Finance Corporation, that corporation did not intervene in the proceeding in the court below and no proof of its approval of the proposed compromise is in the record transmitted to this court. However, a few days after the application of George F. Murphy and other depositors for supervisory writs was filed in this court, the Reconstruction Finance Corporation, through counsel, filed what they styled an answer to certain allegations made in relators' application for the writs. In its so-called answer, the Reconstruction Finance Corporation, appearing through its local attorney, states substantially that it is familiar with all the facts, and that it has · approved the proposed compromise as set forth in the petition of ·the bank commissioner. Relators,, in turn, have filed an opposition to this so-called answer. Relators allege that the Reconstruction Finance Corporation is not a party to the proceeding; that the corporation did not enter any appearance, file any pleading, or take ·any part in the hearing in the court below. For these reasons, relators ask that this court refuse to consider the statements contained in the so-called answer.

Since the approval of the Reconstruction Finance Corporation was made to appear only in the proceeding filed in this Court, it is clear that the relators have not had an opportunity to ascertain by contradictory hearing what interest the Reconstruction Finance Corporation may have in the proposed settlement. It may be observed in this connection that under its laws and regulations no loans may be made by the Reconstruction Finance Corporation unless the corporation is "fully and adequately secured." Code of Federal Regulations, U.S.A., Title 13, § 1.4.

The presumption is therefore that at the time the Reconstruction Finance Corporation made its loan in 1935 to the Hibernia Bank & Trust Company, in liquidation, the loan was adequately secured by the assignment to it of all the known assets of the bank, among which the present claim was not embraced. If the loan was adequately secured in 1935, it would appear, without any evidence to the contrary, that it was even more adequately secured at the present time in view of the improved economic conditions. Although it is alleged in the so-called answer of the Reconstruction Finance Corporation that the proceeds of the settlement, if consummated, or of any litigation involving the claim, would be delivered to the corporation to be applied on the indebtedness· due it by the liquidation, it is not alleged that the corporation's claim is not adequately secured by the other assets of the defunct bank which it holds for that purpose. This allegation is specifically made in relators' opposition to the proposed. compromise. In these circumstances, the alleged approval of the Reconstruction Finance Corporation of the proposed compromise can not be considered by this Court.

Relators argue that the true cause of action, and one which should be followed here, in which, under Articles 3489 and 3490 of the Civil Code, they would be unable to plead prescription, is for the bank commissioner to file a petition against the bank directors jointly and in solido, setting forth the facts from beginning to end of their alleged conspiracy by which it is charged the bank lost more than a million dollars, charging that the directors took possession of the bank's money for their personal purposes by disguised and concealed methods, indicating fraudulent intent on their part, and in violation of their agency; that they divided the money among themselves, particularly the sum of $400,000 among the five directors who are purported to have paid the individual notes for that amount, and that they have never restored the balance of $773,395.95 to the bank which, pursuant to their conspiracy, they still hold in their possession, and for which they have never rendered a true and final account to their principal.

For the reasons assigned, the order of the respondent judge authorizing the state bank commissioner to enter into the proposed compromise herein under review is annulled, and the case is remanded to the district court for further proceedings on the relators' oppositions to the proposed compromise, in accordance with the views herein expressed. The costs of this proceeding are to be paid by the liquidation.

O'NIELL, C. J., dissents and hands down reasons.

ODOM, J., absent.

O'NIELL, Chief Justice (dissenting).

The reasons given by the Judge of the Civil District Court for declining to hear evidence in support of the opposition to the proposed compromised settlement are to my mind sufficient. Section 1 of Act 300 of 1910, which authorizes the bank commissioner, on the order of the district judge, to sell or compromise, or compound, all doubtful claims, does not require the judge before approving a proposed compromise to do anything more than to see that the claim is a doubtful one and hence that the bank commissioner is not attempting to abuse the authority or discretion which the law vests in him. As I understand, there is no dispute that the claim which the commissioner proposes to compromise in this instance is a doubtful claim. The allegations of fact made in the opposition to the proposed compromise, if assumed to be true, do not show that the commissioner is attempting to abuse his discretion. I do not know how far the order of this court will compel the judge to go in the hearing of evidence and in deciding whether the claim which the commissioner proposes to compromise is a doubtful claim. The judge has no right to decide—much less is it his duty to decide—in this proceeding in which the debtors are not before the court—whether the claim is one which the commissioner would be sure to collect—or is one which he could not possibly collect—by means of a lawsuit. If the judge is obliged to hear evi-

dence and have a complete trial on the question as to how doubtful the claim is, he will be hearing and deciding issues which are not before him on the question whether the proposed compromise should be made. If the judge is obliged to have a complete trial of the question of collectibility of the claim, I assume that there will be a right to an appeal from his decision. The result would be, whenever the bank commissioner proposes to compromise a doubtful claim, that either this court or the court of appeal will be the one to order or to refuse to order the bank commissioner to compromise the claim. If the law maker had intended that proposals of the bank commissioner to compromise doubtful claims should be dealt with by the judge as lawsuits between the commissioner and the bank's depositors, the statute would require the service of citation upon the depositors—or at least some kind of notice to them. On the showing that the claim is a doubtful one, and in the absence of any showing that the bank commissioner is attempting to abuse the discretion vested in him by the act of 1910,—and particularly in the absence of any showing that the Judge of the Civil District Court has abused his discretion in approving the proposed compromise,—I respectfully decline to subscribe to the decree rendered by this court in the exercise of its supervisory jurisdiction. It was for these reasons that I declined to subscribe to the granting of the writ of certiorari in this case, directed to the Judge of the Civil District Court, when the relators asked for the writ four months ago.