15 So.2d 369

In re INTERSTATE TRUST &
BANKING CO.

No. 37068.

July 13, 1943.

Rehearing Denied Oct. 5, 1943.

Samuel J. Tennant, Jr., and William H. McClendon, Jr., both of New Orleans, for Interstate Trust & Banking Company in liquidation, appellants and appellees.

O'Niell & O'Niell and James C. Henriques, all of New Orleans, for Marcus & Corkern & Flanders, and Walter V. Marcus, and Bert Flanders, Jr., appellants.

HIGGINS, Justice.

Walter F. Marcus and Bert Flanders, Jr., attorneys-at-law, and the partnership of Marcus and Corkern and Flanders, of which they are members, filed a rule against the Interstate Trust & Banking Company, in liquidation, claiming the sum of $165,000, alleged to be the balance due them as an attorneys' fee for services rendered in the liquidation.

The plaintiffs, in a very lengthy motion, alleged that they were employed and served as the attorneys for the liquidation estate from January 4, 1934, to May 15, 1941, when they resigned, with full reservation of their rights to claim the balance due them on account for services rendered under a contract of general employment; and that on May 13, 1942, after they had requested the Bank Commissioner in charge of the liquidation to fix the balance of the fee due them, he fixed the amount at $10,-150, which they refused to accept.

The Commissioner then filed a petition in the district court, asking that his action be approved by the judge in an ex parte order. Upon his refusal to approve the fee of $10,150, without a hearing, the Commissioner applied to this Court for a writ of mandamus (No. 36,829) and his application was denied on the ground that he had an adequate remedy by appeal.

The present rule followed and the Commissioner then defended the case in the trial court on three grounds, to-wit:

(1) That under Section 6 of Act 300 of 1910, the authority for fixing the compensation of the plaintiffs, as attorneys, rested in the State Bank Commissioner, and the court is without authority to increase the amount of the compensation fixed by him;

(2) That the plaintiffs' claims for services rendered prior to May 25, 1939, are prescribed by three years' prescription, under Article 3538 of the Revised Civil Code; and

(3) That the sum of $10,150 tendered by the Commissioner, together with the sums

of money heretofore paid to the plaintiffs on account, adequately and reasonably compensate them for all services rendered in the liquidation of the bank.

The judge a quo overruled the first two defenses and, after a trial on the merits, during which time he heard a voluminous amount of testimony and considered numerous exhibits, all contained in the transcript constituting six large volumes, as well as a number of other original court records, awarded the plaintiffs $35,000, over and above the amounts previously paid to them.

The party litigants on both sides appealed.

We shall consider the issues herein in the same order in which they were presented in the trial court.

Section 6 of Act 300 of 1910 provides:

"Section 6. Be it further enacted, etc., That the compensation of the *Special Agent, counsel,* clerical assistance and all other necessary expenses of liquidation and distribution, *shall be fixed by the State Examiner of State Banks subject to the approval of the District Court of the Judicial District in which the corporation under liquidation is domiciled, (provided that the court shall not have power to increase said compensation) and after such approval they shall be paid, on the certificate of the said Examiner as privileged claims, out of the funds of such corporation in his hands, before applying the same to any other liabilities of said corporation. * * *"* (Italics ours.)

The attorneys for the Commissioner contend that under the above quoted section

of Act 300 of 1910, the Commissioner is vested with the sole power and authority to fix the fees of counsel employed in the liquidation; that the district judge has no discretion thereunder and it is his mandatory duty to approve the fees fixed by the Commissioner; that the district judge, in granting his approval, performs merely a ministerial or administrative function and does not exercise judicial authority; and that under the proviso in that section the court is expressly denied the power to increase the compensation fixed by the Commissioner.

The plaintiffs maintain that the correct construction of the above quoted section is that the Commissioner cannot legally fix the attorneys' fee without the approval of the judge; that the Commissioner's action in stating what amount should be paid the attorneys is a mere recommendation to the court; that the action by the court in granting its approval to the Commissioner's recommendation is a judicial function requiring the exercise of discretion which necessitates a hearing and a judgment by the court passing upon the issues before it; that to adopt the interpretation placed upon the provisions of the section by the Commissioner would make the Act unconstitutional, because it would deny the plaintiffs their constitutional rights granted under Section 6 of Article I (Bill of Rights) of the Constitution of Louisiana, to have their rights determined in court through adequate remedy and by due process of law, and would be conferring upon the Commissioner judicial powers, contrary to Section 1 of Article VII of the Constitution of Louisiana, vesting judicial power

in the several courts of this State; that the prohibition against the court increasing the fee fixed by the Commissioner has application only when both the Commissioner and the judge have acted; that until the judge has approved the fixing thereof, the fee has not been fixed but only recommended; that as the fee cannot be legally fixed until both the Commissioner and the judge have acted, there can be no increase of a fee that has not been fixed; and that when both the Commissioner and the judge have acted, the judge cannot thereafter increase the fee.

It is a well-recognized rule of statutory construction that when the provisions of an Act are susceptible of two constructions, one which would make the Act unconstitutional, and the other which would uphold its constitutionality, the court should adopt the one that gives validity to the statute.

In the case of Meyer v. Board of Trustees, etc., 199 La. 633, 6 So.2d 713, 716, the widow sued for a pension and the defendant Board, which had refused the widow's claim for the pension, contended that under the express provisions of Section 3 of Act 43 of 1902, as amended by Act 27 of 1914, its action was final and conclusive. The plaintiff's attorney countered by stating that if that construction were placed upon the provisions of the Statute, it would render it unconstitutional in violation of Section 6 of Article I and Section 1 of Article VII of the Constitution of the State of Louisiana.

In affirming the judgment of the trial court, we stated:

"It would be most unusual, if not extraordinary, to hold that the Legislature intended that the Board, which is given the full power and authority to administer the pension fund, is the sole and only judge of the legal rights of the widow under the provisions of the statute and that its decisions would not be subject to review by the courts. The Board under these circumstances would be the final judge of its own case in which it was involved as a party.

\*  \*  \*  \*  \*  \*

"\* \* \* As the language in question is susceptible of a construction other than that given it by the defendant, in order to avoid declaring that part of the statute unconstitutional, we shall not construe it as an attempt by the Legislature to deprive the claimant of her right to resort to court, and the court, of its jurisdiction to hear and determine the case. State ex rel. Tulane Homestead Association v. Montgomery, 185 La. 777, 171 So. 28; 16 C.J.S., Constitutional Law, § 98, p. 234 et seq. \* \* \*

"Counsel for the defendant argues that the district court and this Court have no right to consider the question of the constitutionality of the pertinent part of Section 3 of the statute, because the plaintiff did not specially plead it.

"In the instant case, the special plea, the exceptions of no right and no cause of action, and the objection to the evidence all being founded on the defendant's interpre-

tation of Section 3 of the statute, that the Board's decision was final and not subject to judicial review, the jurisdiction of the district court to hear and determine the case was necessarily involved. In short, the proper interpretation of Section 3 was placed squarely before the court by the defendant. The Legislature is powerless to deprive the courts of their constitutionally conferred jurisdiction. When the defendant's attorney in his argument before the district court made clear his position that under his interpretation of the statute, the court had no jurisdiction to entertain the case the plaintiff's attorney promptly met this construction by pointing out that to give Section 3 of the statute the effect which the defendant sought would render it unconstitutional. Therefore, the issue of the proper construction of Section 3 of the act was raised by the defendant and was met by the plaintiff, and the trial judge had the right to pass upon it.

\* \* \* \* \* \*

"We conclude that the trial judge had the right and jurisdiction to consider the contentions made by the defendant and the plaintiff, respectively, as to the proper interpretation of the part of Section 3 of the act in question and that he correctly maintained the plaintiff's construction thereof, giving it constitutional effect."

See, also, Kemp, Dist. Atty. v. Stanley, Atty. Gen., 204 La. 110, 15 So.2d 1, this day decided; and State ex rel. Porterie, Attorney General et al. v. Smith, et al., 184 La. 263, 166 So. 72.

In the case of Oakley v. Davis et al., 142 Wash. 432, 253 P. 648, 652, the Supreme Court of the State of Washington had a question before it where the factual and legal situation was practically identical with the instant case. The statute provided that the attorney could be employed without the approval of the court but his fee must be fixed with the judge's approval. The attorney was employed through the Commissioner and performed legal services for about four and a half years. There was a change in the State Administration and a new Supervisor of Banks was appointed to become the liquidator of the distressed bank. The new liquidator at first declined to fix the fee but permitted the attorney to continue to perform services. The attorney resorted to court and the liquidator was directed to fix the fee and he fixed an arbitrary one at approximately $7,500, and contended that the court was powerless to change it. It was held that there could be no fixing of the fee unless the court approved it and as this had not been done, it would be a deprivation of the attorney's constitutional right if the statute were construed so as not to permit the court to fix the fee. The court interpreted the statute to mean that there was no legal fixing of the fee until the approval thereof by the judge, and stated:

"Undoubtedly, as contended by appellants, the intent of the Legislature was to avoid excessive expenses and charges in all such cases, and it also clearly intended that just and reasonable compensation should be allowed, and to avoid a possibility of arbitrary action by which either too much or too little might be allowed, all allowances were made subject to approval by the court. Can this statute mean, as

appellants seem to contend, that the courts must forever go on disapproving improper allowances and re-referring the matter to an official who has already clearly demonstrated an inability or an unwillingness to make a fair and reasonable allowance?

\* \* \* \* \* \*

"We might proceed on the theory that respondent's services are his property and that no legislative act may deprive him of the right to receive fair and reasonable compensation therefor without a proper hearing except in violation of familiar constitutional provisions. But it is unnecessary to enter upon a discussion of that phase of the case. We have examined all of our cases referring to the review by the courts of the acts of boards and officers, and find none which may be considered an authority for appellants' contention. Without attempting to lay down a general rule applicable in all cases, we have no hesitancy in saying that, under the section of the statute here applicable and hereinbefore quoted, the supervisor, who stands in the same position as the examiner at the time of the enactment, had ample opportunity to exercise his discretion and failed so to do. The trial court, with perhaps more consideration than was required, by the interlocutory order offered still further opportunity, which was not used for the purpose intended. To further refer the matter to the department would be useless and idle, resulting probably only in further delay to the detriment of all concerned. In such a case, where there is evidence upon which the amount can be fixed and allowed, the court is not powerless to give relief, but may ex-

ercise its discretion and by its judgment make the proper award."

In Baynes v. Bank of Caruthersville, 118 S.W.2d 1051–1053, the Springfield Court of Appeals of Missouri had under consideration a statute very similar to our own, where the question of whether or not the judge had to approve the fee fixed by the Bank Commissioner as a mere ministerial duty. In deciding the contrary, the Court held:

"As used in the statutes the words 'approved' and 'approval' must be considered in at least two connections—first, with the duty of the court and second, in connection with the word 'fix.' There are instances when the words 'approved' and 'approval' as used in the statute contemplate the doing of a purely ministerial act. Better Built Homes & Mortgage Company v. Nolte et al., 211 Mo.App. 601, 249 S.W. 743. But as applied to a court whose duty it is to supervise, in a large measure, the liquidation of a state bank, within its jurisdiction the words do not contemplate the court's approval as a purely ministerial act or duty. The words as here used call for the exercise of judicial discretion and determination, a hearing and judgment by the court passing on the matter before it. 6 C.J.S., Approve, p. 129.

\* \* \* \* \* \*

"In passing on fees or expenses 'fixed' or allowed by the Commissioner of Finance, the trial court is not a mere 'rubber stamp' but is deciding a case. He must hear evidence, determine the reasonable value of the services rendered and ascertain under all the facts and circumstances whether or

not the allowances made or 'fixed' by the department were just and reasonable and enter a judgment accordingly. The court should exercise a sound judicial discretion and approve reasonable fees fixed by the department and disapprove unreasonable fees allowed by the department or asked for by the lawyer and the only question should then be whether or not the trial court has abused its discretion in approving or disapproving any allowances made."

See, also, In re Hibernia Bank & Trust Co., 203 La. 195, 13 So.2d 833.

An examination of the provisions of Act 300 of 1910 shows that in the liquidation of banks, the Commissioner cannot take any substantial action without the approval of the court and the proceedings thereunder to that extent are judicial and to say that the court has not the power to fix fees when legal services have been rendered and accepted is not consonant with the provisions of the statute.

■ Returning now to the provisions of the Act, it will be observed that the compensation of counsel shall be fixed by the Commissioner subject to the approval of the district judge, who shall not have the power to increase the compensation. This means that after the Bank Commissioner has fixed the fee and the court has approved it—both having acted in the matter with the consent of the claimant or attorney, or after hearing—then the court cannot increase the amount of the compensation fixed by the Commissioner with the approval of the judge. The statute does not contain any prohibition against the court determining the amount of fees which have not been legally fixed, either by consent of the parties or after hearing. The inhibition against increasing the attorneys' fees is after they have been legally fixed, as above stated.

The above construction is in keeping with the provisions of the statute and prevents it from being declared unconstitutional.

■ The Commissioner contends that the power to fix fees of counsel is lodged solely in him, under the statute, and that the action of the court in approving the same is not a judicial function. Obviously, if the Legislature placed a duty upon the court other than one of exercising a judicial function, which necessarily involves the use of discretion, then the legislative act would be unconstitutional and violative of Section 3 of Article VII of the Constitution of 1921, which provides "No function shall ever be attached to any court of record, or to the judges thereof, except such as are judicial."

■ The plea of three years' prescription, under Article 3538, Revised Civil Code, is leveled at the claim for services rendered more than three years prior to the filing of the motion herein on May 25, 1942. The defendant's theory is that each service rendered in the multiple transactions is separate and identifiable and that separate fees were due for each and every one of these numerous transactions and, therefore, prescription began to run immediately and was not interrupted by payments at regular intervals, such periodical payments being imputed to the oldest items and therefore

fees or claims remaining unpaid for more than three years from the date the services were rendered are prescribed. The trial court properly held that the evidence showed that the general employment in this case was for the services of the attorneys throughout the liquidation; that they were continuous; and that it was contemplated there would be reasonable, fair, and adequate compensation paid to them at the end of their employment, after allowing due credit for payments made on account from time to time.

The understanding that the plaintiffs had with Mr. Begnaud, the Bank Commissioner, and his predecessor, in regard to their fee, was that there would be a final settlement at the termination of the liquidation proceedings. They were not employed on a piece-work-basis, requiring separate bills for each particular legal matter that they handled. These attorneys represented the liquidation in the same manner that attorneys represent successions, receiverships, and bankruptcy proceedings.

In the defendant's petition of May 13, 1942, where he sought to have the court approve the $10,150 balance of the fees due the plaintiffs, it is stated that it was "for services rendered in connection with matters pertaining to liquidation."

It is difficult to understand how it can be said that there were to be separate fees for each transaction when this was not even suggested during the entire period of more than seven and one-third years in which the services were rendered, and when the actions of the Commissioner and the attorneys show very clearly that it was one continuous general employment without special fees or monthly compensation.

In the case of McManus v. Allan et al., 32 Cal.App.2d 275, 89 P.2d 690, it was held that where legal services are rendered for an indefinite period of time under an agreement, expressed or implied, and no time of payment is specified, the statute of limitation begins to run against the cause of action for payment after the legal services end. See, also, Wilson v. Wilson, 147 Kan. 103, 75 P.2d 277; Jones v. Peabody, 182 Wash. 148, 45 P.2d 915, 100 A.L.R. 64; and Pressas v. Mendiburn, 4 La. 128.

The cases of Lucas v. George M. Cox, Inc., 186 La. 263, 172 So. 153, and 187 La. 813, 175 So. 584, where the attorney's theory of a lumpsum fee by the year was rejected by the court under the facts of the case; the case of Gardiner v. Montegut, La.App., 175 So. 120, where the plaintiff worked on a monthly salary and received monthly payments; and Shannon v. Boh Bros. Const. Co., La.App., 8 So.2d 542, where the laborer sued to recover additional wages for overtime alleged to be due more than one year prior to the filing of the suit, are not in point.

The final issue is the quantum of fee due the plaintiffs for the services rendered.

■ In determining such questions, under the jurisprudence, the courts consider the value of the estate administered, because it reflects to a large extent the responsibility imposed upon the attorneys. The amount, type and nature of the work per-

formed are significant factors. The results obtained and the amount made available for distribution must be given serious consideration. The length of time during which the services are rendered and the ability, skill, and efficiency of counsel are also important equations.

On January 4, 1934, Jasper S. Brock, State Bank Commissioner in charge of the liquidation of the Interstate Trust & Banking Company, employed the plaintiffs as attorneys therefor. They served under him until May, 1940, when Mr. Brock was succeeded by Wilfred B. Begnaud, as State Bank Commissioner. Mr. Begnaud retained the plaintiffs in the aforesaid capacity under the same arrangements until May 15, 1941. On the latter date, Mr. Begnaud, without assigning any reason therefor, asked the plaintiffs for their resignation. It is not claimed that there was any dissatisfaction or complaint about the manner in which the plaintiffs were performing their work. The attorneys complied with the Commissioner's request, with full reservation of, and without prejudice to, their rights to collect the balance due them for services rendered during the period of seven and one-third years in which they served the liquidation estate. From the date of their resignation or the termination of their employment until May 15, 1942, negotiations were carried on between the parties in an effort to compromise the claim for attorneys' fee. It was expressly stated in various communications that, in the event an amicable settlement was not made, the plaintiffs reserved their rights to claim the full amount of the fee said to be due

them. The parties were unable to adjust their differences and on May 13, 1942, or twelve days before this suit was filed, Commissioner Begnaud presented a petition to Honorable Paul E. Chasez, Judge of Division "A" of the Civil District Court, requesting him to sign an ex parte order fixing the balance of the fee due the plaintiffs at $10,150. The judge declined to approve the order. The Commissioner then applied to this Court for a writ of mandamus to compel the judge to sign the order as a ministerial duty. The application was denied. (No. 36,793 of the Docket of this Court.)

When the trial judge overruled the Commissioner's exceptions of vagueness to the plaintiffs' motion, he applied to this Court for writs under our supervisory jurisdiction, and they were likewise denied. (No. 36,829 of the Docket of this Court.)

On the trial of the case on the merits in the district court, it was proved that the Bank maintained its main office in New Orleans, together with four branches, and besides the usual banking and trust departments, it also operated a foreign department, a mortgage department, a bond department and an insurance department; that the value of the assets of the Interstate Trust & Banking Company at the incipiency of the liquidation was $17,843,472.46, which assets were located in a number of parishes throughout this State, in other states of the Union, and in foreign countries; that the assets administered by the Trust Department totaled $52,567,544.45, which belonged to innumerable trust estates and were being administered by the Bank as

trustee or in some other fiduciary capacity; that the Bank's assets, through liquidation, were reduced by $10,400,186.10; that of this amount, more than one-half, or $5,624,247.18, represented collections of accounts and bills receivable of the Bank; that the gross cash receipts, not including a loan of $619,716.05 from the Reconstruction Finance Corporation, amounted to $11,096,563.34; that $1,500,000 was realized from the Bank's properties, assets and trust department as income during the seven and one-third years in which the plaintiffs served; that at the time the plaintiffs resigned there was on hand $148,000 cash made available for disbursement or distribution; that at the time the Bank was placed in liquidation, it owed accounts and bills payable totaling $1,383,376.68, and its liability to depositors was $12,909,695.98; that during the plaintiffs' tenure, all of the accounts and bills payable were paid in full and the liability to the depositors was reduced by $9,685,420.60, or from $12,909,695.98 to $3,224,275.38; and that as of date May 15, 1941, when the plaintiffs resigned, the liquidation estate had $7,443,286.36 of assets to meet deposit liability of $3,224,275.38. Briefly, the liquidation estate had considerably more than two dollars of assets for each dollar of liability. The depositors are thus assured of payment in full of amounts due them. After they have been paid in full, under the express provisions of Section 10 of Act 300 of 1910, the Commissioner will be compelled to deliver the remaining assets to the stockholders of the Bank. At that time, it appears that assets of a very substantial value, probably sufficient to pay them in full, will be returned to the stockholders.

The plaintiffs' testimony is uncontradicted that they devoted more than eighty per cent of their time, both day and night, and particularly for the first several years of the liquidation, to its affairs. Mr. Flanders, on direct examination, testified for six days, without interruption, in giving a detailed analysis of the work that was performed, covering 473 pages of the record. Mr. Marcus, on direct examination, on 288 pages of the transcript, also gave an itemized statement of the work done. They prepared hundreds of petitions and hundreds of orders, which were signed by the late Honorable Hugh C. Cage, Judge of Division "A" of the Civil District Court, and his successor, Honorable Paul E. Chasez.

The record in this case consists of six volumes constituting 1352 typewritten pages, covering in detail the work performed, as well as documentary evidence showing the same. Numerous original records of the Civil District Court were produced in the trial court and here as further evidence of the great amount of work done by the plaintiffs, covering innumerable transactions and suits. Time and space will not permit us to enumerate them and the intricate legal problems and the involved and difficult matters that these attorneys had to solve and handle.

This Court is not altogether unfamiliar with their efforts, because a major piece of litigation growing out of the liquidation of the Trust Department was considered by us in the case of In re Interstate Trust & Banking Company, 188 La. 211,

176 So. 1. In preparation to filing an account to pay a 10% dividend, the attorneys had examined an enormous number of assets and in writing passed upon their validity in order to meet the requirements of the Reconstruction Finance Corporation to secure a loan of $619,716.05. The account was filed on June 23, 1934. Ninety-eight oppositions growing out of the trust estates were filed against it, each of the opponents claiming the right to be paid in full by preference and priority and a lien and privilege on the general assets of the Bank. The claims of the opponents aggregated over $1,300,000. Each opposition presented a different legal problem and, consequently, had to be tried as a separate case. Months were consumed in trial work alone. As a result of the delay, the money borrowed from the Reconstruction Finance Corporation was returned to it. In the district court, eighty-nine of the oppositions were dismissed and six were maintained. Two of the three remaining oppositions were voluntarily dismissed and the other, by agreement between counsel, was held in abeyance. The opinion of the judge, the late Honorable Hugh C. Cage, who tried the case, covers 300 printed pages and not only shows the tremendous amount of work done and performed by the plaintiffs herein, but indicates the skill and ability of counsel, who successfully tried the case against a great many of the ablest members of the Bar. Appeals were taken to this Court by sixty-five of the opponents. We dismissed all of the oppositions with the result that a complete victory was won in favor of the liquidation estate.

When counsel were originally employed, because of bank failures conditions generally were very uncertain and in order to meet the tremendous demands made upon them as attorneys for the liquidator, they were compelled to employ three associate counsel and extra stenographic help. The office force worked in shifts—some all day and others from the evening until 12 o'clock at night. In the beginning, to meet this added expense, the Commissioner recommended to Judge Cage an allowance of $800 per month and he authorized the payment of that sum. Subsequently, when the work slackened, this amount was reduced voluntarily by the plaintiffs to the sum of $600 per month.

C. W. Hogan, who was the liquidator of the Interstate Bank under both Bank Commissioners from the inception of the liquidation to the time of the trial of this case, as a witness for the defendant, on cross-examination, stated that it was necessary to constantly consult the attorneys about innumerable matters and that the fine results achieved in the liquidation up to the time the plaintiffs severed their relations' were due to their "very helpful" and "exceptionally good" services.

Mr. Myron Turfitt, the Assistant Trust Officer, a witness for defendant, made a similar statement.

On January 19, 1937, Mr. Brock recommended to Judge Cage that the plaintiffs be paid, on account of their ultimate fee for services rendered the liquidation, the sum of $46,250 and the judge approved the recommendation. Similar action was taken on January 5, 1939, when the Commission-

er paid the plaintiffs $75,000 on account of their fee, making a total of $121,250 paid direct to the plaintiffs as attorneys' fee from the liquidation estate, as distinguished from any fees that they might have received from third persons who had interrelated business with the liquidation, such as fees for collecting notes, notarial fees, etc. This item does not include the sum of $68,600 which was paid in installments of $800 and $600, as cash advanced on account of added expenses during the seven and one-third years the plaintiffs served.

The plaintiffs placed three reputable, prominent and experienced members of the Bar on the stand, who testified as experts, their qualifications as such being admitted by the defendant, namely, E. Howard McCaleb, Sr., who has been practicing law for many years, Richard T. McBride, the President of the New Orleans Bar Association, and Wm. J. Waguespack. They testified that, taking into consideration the size of the estate, the extent of the services, and time required to perform them, the involved problems presented, the ability and capacity of the attorneys and the results achieved, an additional fee of $165,000 was fair and reasonable.

The only evidence tending to contradict their testimony is that of Honorable W. T. Goff, First Assistant Attorney-General, who stated that he considered $10,150 adequate as an additional fee and made the recommendation to the Commissioner to fix it at that amount after spending several months examining the records of the liquidation.

It is argued by the Commissioner's attorneys that the testimony of Assistant Attorney-General Goff and the recommendation by the Bank Commissioner—that $10,150 is a reasonable additional fee to fully and finally compensate the plaintiffs—should be given great weight in determining the question of quantum. The plaintiffs' counsel point out that the record shows that the attorneys representing the Commissioner in the present case were paid $7,500 cash on account of their fee of $17,500 for defending this suit and advanced $300 cash for expenses and, therefore, the Commissioner's recommendation and the Assistant Attorney-General's statement that $10,150 is a reasonable additional fee should be disregarded because, if these officials seriously considered that the plaintiffs were entitled to only $10,150, they certainly would not agree to pay $17,500 attorneys' fee plus $300 expenses to defend such a small claim. They further note that $17,500 is in excess of 10% of the amount of their total claim of $165,000, whereas, they are only claiming 2½% on the inventory value for their clients' fee. They also say while the amount of the fee that the Commissioner agreed to pay his present attorneys is not determinate of the value of the plaintiffs' services, it is pertinent to the issues and, in concluding, they state that the Commissioner's position, if not inexplicable, is at least very difficult to understand.

On this subject, we may say that while expert opinion in such cases is helpful and a guide, it is not necessarily controlling and that the Court must reach its own conclusion after weighing all of the evidence and circumstances, and then award a fee that is neither excessive nor

inadequate. Dinkelspiel & Hart v. Pons, 119 La. 236, 43 So. 1018; Peltier v. Thibodaux, 175 La. 1026, 144 So. 903; Succession of Robinson, 188 La. 742, 178 So. 337; Succession of Vatter, 192 La. 657, 188 So. 732; and Succession of Wood, 186 La. 181, 182, 171 So. 843.

■ The amounts awarded in other cases of a like or similar nature may also be helpful in determining a fair and reasonable fee to be paid the attorneys herein for legal services rendered.

In the case, In re Louisiana Savings Bank & S. D. Co., 40 La.Ann. 514, 4 So. 301, the bank was in liquidation and the amount distributed was $103,000. The attorneys for the liquidation were allowed $10,500 as their fee, or approximately 10% of the value of the amount distributed.

In the Succession of Herdman, 161 La. 762, 763, 109 So. 482, this Court allowed attorneys' fees of $30,000, where the inventory value was $465,000, or approximately 6½% thereof. In that case, the Court said:

"While this court, as a general rule, has limited attorneys' fees in succession matters to 5 per cent. of the amount of the inventory, yet this is not an ironclad rule without exception, as shown by the decision of this court in the Succession of Pons, 142 La. 721, 77 So. 515, Ann.Cas.1918D, 939, in which a fee of $33,500 was considered well earned in the defense of a suit of interdiction, contested during a period of nearly three years, and involving the control of an estate appraised at nearly $350,000."

In the testimony, the case of Succession of Mrs. John Dibert (No. 227,678 of the Docket of the Civil District Court) was referred to as a standard for fixing the fees in large estates. Mrs. Dibert died on August 27, 1938 and her succession was opened on November 18, 1938, and completed on November 6, 1942, or within four years. The gross assets of the estate were inventoried and appraised at $5,123,000 of which $3,600,000 were United States Treasury Bonds and notes and $282,000 represented cash. The total attorney's fees paid for representing the estate exceeded $174,000. On a percentage basis, the amount was between 3% and 4% of the gross estate where almost $4,000,000, or approximately 80%, was cash or the equivalent thereof, requiring no tedious collection or extraordinary work.

In the recent cases involving attorney's fees in the liquidation of homesteads, i.e., In re Aetna Homestead Association, 199 La. 929, 7 So.2d 188, and In re Tulane Homestead Association, 202 La. 221, 11 So.2d 536, this Court allowed attorneys' fees of approximately 4% of the appraised value of the assets contained in the inventory.

Counsel for the Commissioner contend that there was not an inventory and appraisal made of the assets of the Bank, as required in succession proceedings and, therefore, the minimum fee fixed by the rules of the New Orleans Bar Association would be inapplicable here, even though Commissioner Brock recommended that the compensation be figured on that basis and Judge Cage signed an order approving the recommendation to the extent that the compensation was not to exceed 2½% under the minimum fee bill of the New Or-

leans Bar Association. The record shows that the inventory and statement used by the Commissioner and his liquidator, as well as the attorneys and the courts, consisted of an itemized list of all of the assets of the Bank and the values placed thereon by its auditors, representing the book value thereof. The attorneys for the Commissioner contend that this amount is too high, as it was shown that there were $2,000,000 of worthless assets. They also argue that the assets of the Bank that were easy to liquidate should not be considered, if the fee is predicated upon a percentage basis. By deducting all of the cash advanced for expenses, as well as the amounts ordered paid for attorneys' fee, notarial fees, attorneys' fees earned together with out-of-town lawyers on business forwarded, and fees earned in trust matters, and considering the $10,150 finally offered by Commissioner Begnaud in settlement, amounting in all to the sum of $237,980.84, the commissioner's attorneys conclude that an adequate fee for the plaintiffs' services has been and will be paid.

The plaintiffs take the position that the rules of the New Orleans Bar Association governing minimum fees in succession matters are applicable here, because the inventory and itemized statement of all of the assets of the Bank, with values stated thereon, was equivalent, practically speaking, to an inventory and appraisal in succession matters and was legally so treated by the court, the Bank·Commissioners, the Liquidator, and every one connected with the liquidation, and that, therefore, to avoid confusion resulting from figuring appreciation and depreciation on assets, the judge of the district court and the Bank Commissioners had expressly indicated that would be the way the fees would be fixed and determined by them when the liquidation was completed or when the attorneys severed their relations in the matter. They point out that when Mr. Begnaud took charge as Bank Commissioner in 1940, he permitted the attorneys to continue to work under the same arrangements, without in any way indicating that that would be an unacceptable way of figuring and determining their compensation. The plaintiffs say that even if the $2,000,000 depreciation is deducted from the gross value of the estate and the appreciation on two items amounting to $350,000 were added, plus capital gains, all together amounting to the sum of $670,261.37, the fee, figured on the basis of 2½% of the value of the inventory, after deducting depreciation and adding appreciation and capital gains, would be in excess of the amount they claim. They finally state that whether the court figures their fee on the basis of actual services rendered or on a percentage basis, the result would be the same as it will appear from either calculation or the record showing the value of their services that they are entitled to the remainder of the fee claimed.

The contention that the inventory reflects the book value of the Bank's assets, which is higher than the appraised values usually found in succession inventories and, therefore, should not be used to fix the fee on a percentage basis, overlooks the fact that the percentage is only 2½% or the minimum fee to be charged in successions under the New Orleans Bar·Association's Rules.

It also ignores the fact that the liquidation of a bank is much more complicated and involved than the opening, administering and closing of a succession. Consideration must also be given to the circumstance that the plaintiffs completed the most difficult part of the liquidation by having the major problems solved before they were asked to resign· without any reason or cause.

The argument that the cash distributed to the depositors and creditors should be the aggregate amount upon which the 2½% is figured fails to take into consideration that the assets of a distressed bank are usually sold at sacrificial prices, except those consisting of cash or its equivalent.

Judge Cage, on December 22, 1938, entered the following order:

"Let Jasper S. Brock, State Banking Commissioner, be and he is hereby authorized to compensate attorneys he has employed to handle the legal phases of this liquidation in amounts, the aggregate· of· which is not at any time to exceed the minimum amounts that a member of the New Orleans Bar Association should charge under the general provisions contained in the association's schedule of minimum charges for the administration of successions, payments thereof to be made from time to ·time as the bank commissioner or his proper representatives in his or their discretion may see fit."

Necessarily, the inventory that Judge Cage had in mind in rendering his 2½% order was the inventory and the bank statement filed by the Bank Commissioner and prepared by the Bank's own auditors, otherwise the judge's order could not be carried out and would be a useless and vain thing. To what other inventory could his order have referred? Unless the order be regarded as a nugatory force, it must be applied to the only inventory in the record at the time of its rendition. Reasonableness requires us to say that the order applies to the inventory and statement presented by the Banking Department and accepted by the court as compliance under the very statute under which the estate was being liquidated.

The minimum fee fixed by the schedule of the New Orleans Bar Association for the administration of a succession is as follows: $10,000, 3%; beginning at $10,000· and in excess thereof, 2½%.

It appears from the record that assets listed in the inventory and statement have depreciated to the extent of $2,000,000 but two other assets up to the time the plaintiffs resigned had appreciated in value to the extent of $350,000 and other capital gains for this period increased this amount to the sum of $670,261.37. There was also at that time $148,000 in cash available for disbursement or distribution.

The defendant's attorneys suggest that the plaintiffs be allowed 2½% on $11,096,-563.34, which they concede was paid to the creditors and distributed to the depositors, on the theory that the cash disbursed shows the actual services rendered by the plaintiffs until the end of their employment.

The fallacy in figuring 2½% on the actual cash distributed among the· creditors ·and the depositors, as the basis of determining the value of the actual services ren-

dered, is that it fails to take into consideration the extensive and valuable services rendered by the attorneys in connection with the unliquidated assets amounting to $7,443,286.36, including the largest office building in the State of Mississippi, the Canadian timber lands and the Plaquemines Parish oil lands. It likewise fails to take into account the tremendous amount of work that was done by the attorneys in completely liquidating the affairs of the Trust Department of the Bank involving assets belonging to the Trust estates, as distinguished from the Bank's liquidation estate, of $52,567,544.45. There is nothing in this record to indicate in the slightest that the attorneys were to perform that service gratuitously, but, on the contrary, the evidence shows very clearly that it was understood they would be paid a reasonable compensation for that work. No one could fairly or reasonably conclude that the attorneys and their office force would render the valuable services they did in behalf of the Bank without being compensated for their professional time and actual expenses.

In the light of the foregoing discussion, we come to the immediate consideration of determining what is a fair and reasonable attorneys' fee under the facts and circumstances of this case. We conclude that Judge Cage contemplated a gross fee for the handling of the liquidation of 2½% on the inventory value, or the minimum fee provided by the schedule of the New Orleans Bar Association and that fees earned on interrelated or correlated matters would be debited against the total

final fee, as well as cash advanced for expenses. Since it was shown that there had been a depreciation or loss in value of assets to the extent of $2,000,000, this amount should be deducted from the gross inventory value of $17,843,472.46. As it was shown that two of the assets, without considering the others, had appreciated in value to the extent of $350,000, and there had been an increase in the value of the estate so that there was a total increase and appreciation of $670,261.37, this amount should be added to the inventory value, because if it is proper to deduct depreciation, then it is necessarily proper to add appreciation. This gives a total value of $16,513,733.83. Two and a half per cent of this amount is $412,843.34, which would be the gross fee to be paid for all legal services rendered, if the liquidation were completed. Section 10 of Act 300 of 1910 expressly provides that when all of the creditors and depositors and the costs of liquidation have been paid in full, the Commissioner shall return the remaining assets to the stockholders of the bank. In short, the liquidation is completed at that time insofar as the Commissioner is concerned. As the liquidation was not completed at the time the attorneys complied with Mr. Begnaud's request for their resignation, or after they had served a little longer than 7⅓ years, it is necessary to determine what percentage of the liquidation had been completed at the time these attorneys severed their relations with the liquidation. Our calculations, based upon total liabilities of the Bank of $14,293,072.-66 at the time it was placed in liquidation and the amount of liability discharged to

the creditors and depositors of $11,068,798.-28 at the time they ended their employment, show that the liquidation was more than 77% complete. However, giving plaintiffs credit for services rendered to the point where 75% of the liquidation was complete, they would be entitled to a fee of 75% of $412,843.34 or $309,632.50. Deducting from this amount the sum of $245,649.03, representing all cash advanced to take care of additional expenses, attorneys' and notarial fees paid both by the liquidation estate and third parties, attorneys' fees earned on collection items paid by third parties, the attorneys' fees paid both to correspondent attorneys and plaintiffs and the amounts previously paid them on account of their attorneys' fee by the Bank Commissioner, there would still be a balance due the plaintiffs of $63,983.47. Obviously, since the above calculations are made on the basis of the value of the liquidation estate, as distinguished from the Trust Department, which belonged to third persons and was administered by the Bank as trustee, the attorneys have not been paid and would not be paid any amount for their services rendered in fully liquidating the Trust Department amounting to $52,567,544.45. If they were to be paid one-tenth (1/10) of one (1%) per cent on that amount, they would be entitled to a fee of $52,567.54 for liquidating the Trust Department. Adding $63,983.47 to $52,567.54, the plaintiffs would be entitled to an additional fee of $116,515.01. Judge Cage's order fixing the gross attorneys' fee under the minimum fee bill of the New Orleans Bar Association of 2½% of the inventory value apparently contemplates that the Trust De-

partment would be liquidated for that same fee. But the liquidation of the Trust Department cannot be completely eliminated from consideration when we consider to what extent the whole liquidation was completed. As the liquidation of the Bank, disassociated from the liquidation of the Trust Department, had been more than 77% complete, it is our opinion that the full liquidation of the Trust Department would be 8% of the liquidation of the whole. This is a very modest allowance. Briefly, the plaintiffs had liquidated 85% of all the Bank's affairs at the time the Commissioner put an end to their services. Eighty-five (85%) per cent of the total or the gross fee of $412,843.34 amounts to $350,916.83. Deducting therefrom the amount of $245,649.03 previously explained, leaves a balance of $105,267.80, which is due the plaintiffs for services rendered. This sum is less by $11,283.21 than the amount which would be due them if the Trust Department were figured separately as above indicated. Adding all cash advanced, attorneys' fees and notarial fees and excepting therefrom $68,600 advanced for additional expenses and expended for that purpose and one-half of the attorneys' fees paid to correspondent attorneys amounting to $17,813.-69, the plaintiffs previously received $159,-230.84. Adding to that sum—$105,267.-80—would give them a fee less the above mentioned items of $264,498.64 out of which they would also have to pay their regular office expense and help, as distinguished from the three extra associated attorneys and additional stenographic help. Briefly, each attorney would receive $18,-033.98 per year during the 7⅓ year period

they served—out of which amount, we reiterate, they would have to pay 'their regular office expenses and help. We not only consider this a reasonable fee from the standpoint of calculating it on a percentage basis after allowing the deductions which we have made, but also from the viewpoint of fixing the fee ourselves after a review of the testimony and documentary evidence in this case. We consider the fee fair and just to all parties concerned by appraisal of the amount, quality, and effectiveness of work performed by the attorneys and the period of time required to accomplish the favorable result. In arriving at this conclusion, we are not unmindful of the fact that this is a public matter involving a distressed bank, but we also bear in mind that it appears from the record that all of the creditors of the Bank, all of the depositors, and all of the costs of liquidation will be paid in full and there probably will be sufficient assets of a substantial value to pay even the stockholders of this institution in full.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court is amended by increasing the amount awarded the plaintiffs from $35,000 to the sum of $105,267.80, and, as thus amended, the judgment is affirmed; all costs of court are to be paid by the liquidation estate.

O'NIELL, C. J., recused.

ROGERS, J., absent.

PONDER, Justice (dissenting).

On January 4, 1934, the State Bank Commissioner took over the affairs of the Interstate Trust and Banking Company for liquidation. The firm of Marcus and Corkern and Flanders, attorneys-at-law, was employed to handle the legal phases of the liquidation. This firm performed the legal duties in connection with the liquidation until May 15, 1941, at which time the Bank Commissioner gave notice that he desired to change attorneys and requested the resignation of this firm as counsel for the liquidation. In pursuance to this request, counsel tendered its resignation with full reservation of and without prejudice to any fees due. The resignation was accepted. After lengthy negotiations, the parties at interest failed to reach an agreement on the amount of attorneys' fees due.

Thereafter, the Bank Commissioner petitioned the court to grant him authority in pursuance to Section 6 of Act 300 of 1910 to pay the firm of attorneys $10,150.00 as a final and complete payment for all of the services rendered the liquidation. The lower court refused to grant the commissioner this authority on the ground that the attorneys were entitled to a hearing as to the amount due them. Marcus and Corkern and Flanders then brought suit against the Bank Commissioner, claiming a balance of $165,000 as attorneys' fees. The matter was taken up by way of rule, and the lower court gave judgment awarding the plaintiff the amount of $35,000 as a final settlement of all attorneys' fees. Both plaintiff and defendant have appealed.

The sole and only question presented for consideration is the amount of attorneys' fees due the plaintiff.

The comparative statement, made at the instance of the liquidator, shows that the assets of the bank amounted to $17,843,-472.46 on January 4, 1934, at the inception of the liquidation.

The record discloses that the assets of the bank, through process of liquidation, had been reduced on May 15, 1941, to $7,-443,286.36. In other words, $10,400,186.10 of the assets were liquidated during the period of time the plaintiff was serving the liquidation.

There seems to be some dispute as to the amount of cash receipts collected for distribution. The plaintiff contends that a loan obtained from the Reconstruction Finance Corporation of $619,716.05 should be included in the total amount of cash receipts. The defendant takes the position that the amount of the loan should not be included for the reason that the funds were never used for the purpose for which the loan was made.

I gather from the record that this loan was returned shortly after it was made without any of the funds being used for the purpose for which the loan was granted. Under such circumstances, I do not believe that the funds derived from the loan would form a part of the cash receipts collected for distribution. The record shows and it is conceded in plaintiff and defendant's briefs that if the amount of funds derived from the loan are deducted, the cash receipts received through this period of the liquidation amount to $11,-096,563.34.

On June 1, 1934, the Bank Commissioner secured an order from the lower court au-thorizing him to pay the plaintiff $800 monthly, beginning as of January, 1934, to be taken into consideration at such time as the fees for professional services are approved by the court. The plaintiff admits that it has received fees monthly from the liquidator since the date of the order in the amount of $68,600.

On January 19, 1937, the Bank Commissioner, authorized by an order of court, paid the plaintiff $46,250 on account of services rendered.

On December 22, 1938, the lower court entered the following order:

"Let Jasper S. Brock, State Bank Commissioner, be and he is hereby authorized to compensate the attorneys he has employed to handle the legal phases of this liquidation in amounts, the aggregate of which is not at any time to exceed the minimum amounts that a member of the New Orleans Bar Association should charge under the general provisions contained in the association's schedule of minimum charges for the administration of successions, payments thereof to be made from time to time as the bank commissioner or his proper representatives in his or their discretion may see fit."

In pursuance to this order, on January 3, 1939, the plaintiff was paid $75,000 for legal services.

The minimum fee fixed by the rules of the New Orleans Bar Association for the administration of successions is as follows: Up to $10,000, 3%; beginning at $10,000 and in excess thereof, 2½%.

The record shows that the plaintiff was paid notarial fees in the amount of $2,862;

$3,869.81 as attorneys' fees in certain collections for the liquidation; and $13,432.84 for legal services in certain trust matters connected with the liquidation.

The plaintiff admits receiving $17,818.19 from forwarding attorneys who were employed in connection with the liquidation. Just how much the efforts of the forwarding attorneys contributed to the cash receipts of the bank in liquidation is not shown by the record. However, the forwarding attorneys must have received at least an amount equal to and in addition to the $17,818.19. Such being the case, the liquidation undoubtedly had to pay $35,-636.38 for these legal services. This amount would necessarily have to be credited as a payment on the attorneys' fees.

From the above figures, showing the amounts paid for legal services, the defendant has previously paid $245,651.03 for legal services in connection with the liquidation.

Sometime prior to the filing of this suit, when the plaintiff and the defendant were attempting to negotiate an amicable settlement, the Attorney General was called in to assist them in determining the amount due the plaintiff. Thereafter on February 27, 1942, the plaintiff addressed a lengthy letter to the Attorney General reciting the various services rendered by it and stating:

"We submit that the nearest analogy to a recognized standard on which to base our charge is that adopted by the New Orleans Bar Association as the proper fee for administering successions under administration. That sets as a minimum 2½% of the gross estate. If some allowance be made by

virtue of the fact that the administration was not finished by us, then it would seem fair to say that the cash distribution is the lowest possible valuation on which this minimum should be figured."

Counsel for the plaintiff wrote the Attorney General on April 6, 1942, to the effect that the plaintiff was entitled to 2½% of the actual cash collections, and in event an amicable adjustment could not be reached the plaintiff was entitled to this percentage of the full value of the assets at the time of the commencement of the liquidation.

The order of the lower court of December 22, 1938, has become final and in my opinion controlling of the issues herein involved. No appeal was ever taken from this order, and the time for appeal therefrom has elapsed. Shortly after this order was signed, the Bank Commissioner, on January 3, 1939, paid the plaintiff $75,000. The prior orders of the lower court, authorizing payments to be made to the plaintiff for legal services, did not attempt to fix the amount of or rate of compensation to be paid for the legal services for the liquidation. A careful analysis of the order of December 22, 1938, leads me to the conclusion that the compensation for legal services in connection with the liquidation is based on the cash receipts or collections, and the aggregate payments shall at no time exceed the certain maximum percentage fixed therein.

Plaintiff's letter to the Attorney General of February 27, 1942, and the letter from its counsel to the Attorney General of April 6, 1942, both written sometime prior to the filing of this suit, are indicative of the fact

that the plaintiff was of the opinion that the compensation was to be based on the cash receipts or collections.

The order under consideration definitely places a limitation on the maximum amount of compensation to be paid for the legal services and places no restriction on compensation for a lesser amount. I cannot in the face of this final order agree to award compensation in excess of the maximum amount fixed in this order. However, this does not preclude the awarding of compensation in a lesser amount if the facts justify it.

The cash receipts, covering the period of time during which the plaintiff was connected with the liquidation, amount to $11,096,563.34. The minimum compensation fixed by the rules of the New Orleans Bar Association for the administration of successions is 3% on the first $10,000 and 2½% on the remainder. Applying this rule to the cash receipts, I arrive at the amount of $277,464.08. After deducting the $245,651.03, previously paid, there is a balance of $31,813.05.

The defendant concedes that the plaintiff is due a balance of $10,150 for legal services. The maximum amount that the plaintiff could receive under the order of December 22, 1938, after deducting previous payments, would be $31,813.05. Such being the case, the balance of compensation due for the legal services would be some amount between these last two named figures.

From my appreciation of the testimony of the three attorneys called by the plaintiff, the plaintiff would be entitled to the maximum amount of compensation fixed by the order of December 22, 1938. The only expert called by the defendant was of the opinion that the plaintiff was entitled to a balance of only $10,150. There seems to be no dispute that the services rendered by the plaintiff to the liquidation required approximately all of its time over a period of more than seven years. The plaintiff was engaged in an unusual amount of litigation for the liquidation. Unquestionably the most serious problems requiring legal services arose during the first seven years of the liquidation. Thereafter there would not be a need for such extensive legal services. Consideration should also be given to the fact that the plaintiff was not permitted to complete the liquidation.

From a preponderance of the evidence and the surrounding circumstances, the plaintiff is entitled to the maximum rate of compensation fixed by the order of the lower court of December 22, 1938. After deducting the amounts previously paid, the defendant is due the plaintiff a balance of $31,813.05 as a full and final settlement of the attorneys' fees.

I cannot agree that the purport of the order of the lower court was to fix the fees on the basis of the gross assets listed in the comparative statement. The inventory of a succession reflects an appraised value of its assets. There was no appraisal of the assets listed in the comparative statement. However, if it be conceded that the order bases the compensation on the gross assets listed in the comparative statement, the plaintiff could not recover compensation based on the entire gross assets for the reason that the liquidation has not been

completed. In fact, at the time the plaintiff tendered its resignation, there remained $7,443,286.36 of the listed assets unliquidated. The liquidation of the bank has not as yet been completed. If the plaintiff was awarded compensation on the basis of the liquidated assets, the compensation would be less than it would be if it were based on the cash receipts.

The defendant contends that the compensation fixed by the Bank Commissioner cannot be increased by the courts. In support of this contention, he cites Section 6 of Act 300 of 1910, which reads as follows:

"Be it further enacted, etc., That the compensation of the Special Agent, counsel, clerical assistance and all other necessary expenses of liquidation and distribution, shall be fixed by the State Examiner of State Banks subject to the approval of the District Court of the Judicial District in which the corporation under liquidation is domiciled, (provided that the court shall not have power to increase said compensation) and after such approval they shall be paid, on the certificate of the said Examiner as privileged claims, out of the funds of such corporation in his hands, before applying the same to any other liabilities of said corporation. It is provided that the State Examiner of State Banks shall not receive any fees or other emoluments for special services, or otherwise, out of the funds of any corporation liquidated as provided for herein; and no assistant in the pay of the State Banking Department except such Special Agent as may be appointed as herein provided for, shall receive any such fee or emolument for special services or otherwise out of the funds of a corporation so liquidated."

The answer to this contention is stated in the case of Liquidation of Hibernia Bank & Trust Company, 203 La. 195, 13 So.2d 833, 837, opinion handed down on April 12, 1943, in which we said:

"We can not agree with the proposition that the state banking act authorizes the courts of this State to act merely in administrative capacities in the liquidation of insolvent banking institutions. The affirmance of the proposition would necessarily imply that the courts are nothing more than rubber stamp courts whose only duty is to place the stamp of approval on the action or nonaction of the bank commissioner."

For the reasons assigned, I respectfully dissent.